**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-6851

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RAYMOND ROGER SURRATT, JR.,

Defendant - Appellant.

------------------------------

STEVEN HARRIS GOLDBLATT,

Court-Assigned Amicus Counsel,

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS;
DOUGLAS A. BERMAN, Professor,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:04-cr-00250-RJC-19; 3:12-cv-00513-RJC)

Argued: March 23, 2016                    Decided: April 21, 2017

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, TRAXLER, KING, SHEDD, DUNCAN, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges.

---

Dismissed as moot by published order. Judge Wilkinson and Judge Motz wrote separate opinions concurring in the decision to dismiss the appeal as moot. Judge Wynn wrote a separate opinion dissenting from the decision to dismiss the appeal as moot.

---

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Michael R. Dreeben, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Steven Harris Goldblatt, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., as Court-Assigned Amicus Counsel. Erika L. Maley, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae. **ON BRIEF**: Ross Hall Richardson, Executive Director, Charlotte, North Carolina, Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Scott A.C. Meisler, Assistant to the Solicitor General, Nina Goodman, Lena Hughes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anne M. Tompkins, United States Attorney, Jill Westmoreland Rose, United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. Ruthanne M. Deutsch, Shon Hopwood, Supervising Attorneys, Utsav Gupta, William Hornbeck, Meredith Wood, Ryan W. Cooke, Courtney A. Elgart, Elizabeth Sebesky, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Court-Assigned Amicus Counsel. Douglas A. Berman, Professor of Law, THE OHIO STATE UNIVERSITY, Columbus, Ohio; Jeffrey T. Green, Kimberly A. Leaman, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae.

---

ORDER

---

By order dated February 14, 2017, the court directed the parties to address the impact of the President's commutation of Appellant Surratt's sentence and, in particular,

the questions of mootness and jurisdiction.  Upon consideration of the responses to the court's order, the court finds this appeal to be moot.

The appeal is, accordingly, dismissed as moot.

Entered at the direction of Chief Judge Gregory for the Court.

FOR THE COURT

/s/ Patricia S. Connor
Clerk

3

WILKINSON, Circuit Judge, concurring:

Surratt has received the relief from life imprisonment he was seeking in this case and more. He is also no longer serving a judicially imposed sentence, but a presidentially commuted one. The President's commutation order simply closes the judicial door. Absent some constitutional infirmity in the commutation order, which is not present here, we may not readjust or rescind what the President, in the exercise of his pardon power, has done.

It matters not whether we believe the commutation was too lenient or not lenient enough. We are simply without power to inject ourselves into the lawful act of a coordinate branch of government—one that Surratt willingly agreed to—and supersede a presidential pardon or commutation with a contravening order of our own. After all, "[i]t would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in accepting the commutation which he sought." *Schick v. Reed*, 419 U.S. 256, 267 (1974). Surratt "cannot complain if the law executes the choice he has made," *id.* at 265 (quoting *Ex parte Wells*, 59 U.S. 307, 315 (1855)), even if my dissenting colleague thinks he made a "bad bargain" by accepting the commuted sentence, *id.* at 259.

My dissenting colleague's unwillingness to find moot even this clear-cut a case points to a broader problem affecting our criminal justice system. Insofar as I can detect, there is no such thing as finality in my dissenting colleague's view. Indeed, the principle of finality is not even paid the lip service that presages disregard. Some reason is somehow always found for a case to go on and on and on. To so freely revisit final

4

judgments, as my dissenting colleague would, is to embark on a course that is so vague and so open-ended as to render criminal judgments entirely provisional and good for one day only.

While my dissenting colleague alleges that Surratt's initial sentence was "unlawful," it was indisputably lawful when entered and the correctness of the sentence has divided judges ever since. Let it be said that strict sentences always make for hard cases. It is not for pleasure that the system imposes them. But Surratt had been convicted time and time again for drug-related offenses—including distributional felonies—under federal and state law. The President had every right to calibrate his commutation with these considerations in mind, bringing this saga to an end, both merciful and firm.

DIANA GRIBBON MOTZ, concurring:

I concur in the court's order dismissing this case as moot. Throughout this difficult litigation, the Government has conducted itself in a most admirable manner, offering us candid and insightful assistance. Even my dissenting colleague acknowledges that the Government acted "[c]ommendably" in agreeing that Surratt was entitled to relief regarding his original sentence. I do not read the Government's recent letter regarding mootness to present any departure from its previous commendable assistance to us.

WYNN, Circuit Judge, dissenting from dismissal:

Thomas Jefferson wrote that "the most sacred of the duties of a government is to do equal and impartial justice to all its citizens." Those words impart that all citizens, no matter their plight in life, should be accorded justice in our court system. Today's perfunctory dismissal of Petitioner Raymond Surratt, Jr.'s 10-year effort to obtain a fair and impartial disposition of his case in the federal courts is, if not an outright injustice, at least an abandonment of fairness.

It began when we incorrectly construed 21 U.S.C. § 841(b)(1), the statute pursuant to which Petitioner was sentenced, and thereby subjected Petitioner to a mandatory life sentence, when Congress had established a far shorter mandatory minimum. Then, when Petitioner, *with the government's support*, sought collateral relief on grounds that his unlawful life sentence constituted a fundamental defect of constitutional dimension, we actively appointed independent counsel to argue that Petitioner should spend his life in prison. Apparently unsatisfied with the executive branch's conclusion that Petitioner's sentence was sufficiently unjust to warrant resentencing, we then allowed Petitioner's appeal to go unresolved for years, while Petitioner remained incarcerated under his unlawful life sentence.

And when, in the face of our delay, the President commuted Petitioner's sentence—*partially remedying* the error—we, without prompting or request by either party, but actively on our own, suggested to the government that Petitioner's action was moot. The government got the message, arguing in response to our prompting that

7

(1) Petitioner's collateral attack is moot and (2) there is no "fundamental defect" in Petitioner's sentence that warrants collateral relief.

So today, my good colleagues dismiss Petitioner's action as moot. But if we were to accord Petitioner the relief that even the government concedes is fair by vacating Petitioner's sentence and remanding for resentencing, Petitioner would likely be released because his time-served exceeds the upper end of his now-applicable Guidelines range. None of us disputes that. And, even under his commuted sentence, today's dismissal of Petitioner's action as moot means Petitioner will remain in prison for, at a minimum, several more years. None of us disputes that. It should therefore follow that the disposition of Petitioner's appeal *will likely determine whether Petitioner remains in prison or is released*—meaning that Petitioner's action is not moot because he retains a decidedly "concrete interest" in the resolution of his case. *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013). None of us can dispute that.

Nonetheless, at least by the expression of one of my colleagues, the majority dismisses Petitioner's action as moot on the theory that the President's commutation of Petitioner's concededly incorrect sentence renders his action a nonjusticiable political question because Petitioner is now serving an executive, as opposed to judicial, sentence. But while the Constitution vests the President with broad pardon and commutation authority, neither it nor the case law establishes that "[t]he President's commutation order simply closes the judicial door," as my colleague asserts. *Ante* at 4. Indeed, the President has no authority to *impose* a sentence on any citizen; she can only exercise the authority to pardon or commute an existing judicial sentence. And any part of that judicial

8

sentence that remains after commutation remains a sentence imposed by the judiciary, not the executive branch of government. Simply put, the synergism that my colleague seeks to establish that "the whole is greater than the sum of its parts," may have been apropos in science for Aristotle, but it has no application in law. To the contrary, the part of the sentence that remains after commutation is part of a judicial sentence, not a newly created executive sentence.

My colleague also emphasizes Petitioner's acceptance of the commutation as grounds for dismissal, stating that it is not our job to question the "bad bargain" Petitioner may have chosen in accepting the commuted sentence. *Ante* at 4 (quoting *Schick*, 419 U.S. at 259). But Petitioner had no more than the choice that Thomas Hobson gave to his customers—take it or leave it. In the face of our inaction, Petitioner didn't face a "bad bargain"—it was his "only bargain." That much is evident because when Petitioner accepted the President's commutation, it had been more than 10 months since his case was argued before our Court sitting en banc. Yet, we can, as may be seen in the future, render en banc decisions in cases of far great complexity with head-snapping speed.

Finally, my good colleague maintains that we are "simply without power to inject ourselves into the lawful act of a coordinate branch of government"—the President's commutation of Petitioner's sentence. *Ante* at 4. But we had no difficulty "inject[ing]" ourselves into the executive branch's lawful act of concluding that Petitioner should be resentenced. On the contrary, we appointed independent counsel to argue against the executive branch's position and then gave the executive branch no deference.

9

Neither the facts nor the law support this continuing denial of a lawful punishment for Petitioner. With great respect, I must dissent.

## I.

In 2005, Petitioner pled guilty to conspiracy to possess with intent to distribute more than 50 grams (1.76 ounces), but less than 150 grams (5.29 ounces), of crack cocaine in violation of the Controlled Substances Act, 21 U.S.C. §§ 841(b)(1), 846. Before sentencing, the government filed an information with Petitioner's criminal history, which listed three previous North Carolina drug-related convictions. Because Petitioner had conspired to distribute more than 50 grams of crack, Section 841(b)(1)(A) governed his sentence. *Id.* § 841(b)(1)(A) (2002). Under that provision, Petitioner faced a mandatory minimum term of life imprisonment without release if two or more of those prior convictions constituted "felony drug offenses." *Id.* If Petitioner had committed one prior "felony drug offense," he would have faced a mandatory minimum term of 20 years' imprisonment. *Id.* At the time of Petitioner's conviction, Section 841(b)(1) subjected a drug trafficker dealing in crack cocaine, like Petitioner, to the same mandatory minimum sentence as one dealing in 100 times more powder cocaine. *Id.* § 841(b)(1)(A), (B). As a result of that 100-to-1 powder-to-crack quantity ratio, if Petitioner had distributed powder cocaine, as opposed to crack cocaine, he would not have faced the mandatory minimum and would have been subject to a statutory maximum of 20 years' imprisonment. *Id.* § 841(b)(1)(C).

At the time of Petitioner's sentencing, we had held that a North Carolina drug conviction qualified as a "felony drug offense" for purposes of Section 841(b)(1) if "the maximum aggravated sentence that [the state court] could [have] imposed for that crime upon a defendant with the worst possible criminal history" exceeded one year. *United States v. Harp*, 406 F.3d 242, 246 (4th Cir. 2005) (emphasis omitted), *overruled by United States v. Simmons*, 649 F.3d 237, 247 (4th Cir. 2011). Under *Harp*, all three of Petitioner's prior convictions constituted felony drug offenses. His mandatory sentence was, therefore, lifetime imprisonment. Expressing disdain for the harsh result that *Harp* imposed in Petitioner's case, United States District Judge Robert J. Conrad, Jr. stated that lifetime imprisonment was an "unjust sentence" because Petitioner did not "deserve[] a sentence of life imprisonment" for his crime. J.A. 276. Nevertheless, bound by *Harp*, and "with a great deal of discomfort," Judge Conrad sentenced Petitioner to life imprisonment in October 2005. *Id.*

Five years later, in August 2010, Congress enacted the Fair Sentencing Act, which amended Section 841(b)(1) to reduce the disparity between sentences for powder and crack cocaine offenses. Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010). In particular, the statute increased to 280 grams (9.88 ounces) the quantity threshold for subjecting crack offenders to the more severe punishments set forth in Section 841(b)(1)(A), thereby reducing the powder-to-crack quantity ratio to 17.9-to-1. 21 U.S.C. § 841(b)(1)(A), (B) (2016). The amendment, which remains in effect, responded to both public and judicial outcry regarding the "disproportionate and unjust effect" of the 100-to-1 powder-to-crack quantity ratio on crack offenders, who were

11

disproportionately minorities. *See Kimbrough v. United States*, 552 U.S. 85, 93 (2007); *see also Dorsey v. United States*, 132 S. Ct. 2321, 2328–29 (2012) ("[T]he public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences."); William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 Ariz. L. Rev. 1233, 1266–68 (1996) (explaining that implementation of the 100-to-1 ratio led to significantly higher incarceration rates for black and Hispanic offenders relative to white offenders and significantly longer sentences for black offenders relative to white offenders). The Fair Sentencing Act applies *retroactively*, meaning that the statute's "more lenient mandatory minimums apply to offenders whose unlawful conduct took place before, but whose sentencing took place after, the date [the Fair Sentencing] Act took effect." *Dorsey*, 132 S. Ct. at 2330.

Had the powder-to-crack quantity ratio established by the Fair Sentencing Act been in effect at the time of his conviction, Petitioner would have been sentenced under Section 841(b)(1)(B), rather than Section 841(b)(1)(A), because of the Fair Sentencing Act's revised quantity threshold for receiving the higher mandatory minimums set forth in Section 841(b)(1)(A). 21 U.S.C. § 841(b)(1)(A), (B). Under Section 841(b)(1)(B), Petitioner would face a mandatory minimum term of 10 years' imprisonment if at least one of his prior convictions constituted a "felony drug offense." 21 U.S.C. § 841(b)(1)(B).

On August 17, 2011, on en banc review, we expressly overruled *Harp* in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011), holding that courts may not look to hypothetical enhancements of prior state drug convictions to evaluate permissible terms

of imprisonment under the Controlled Substances Act when the state court never made recidivist or aggravation findings necessary to expose the defendant to such enhancements. 649 F.3d at 243–44. In particular, we held that, when used as a predicate for federal sentencing purposes, the North Carolina Structured Sentencing Act creates separate offenses that allow for separate maximum punishments. *Id.* at 247. Like the Fair Sentencing Act, *Simmons* applies *retroactively*. *Miller v. United States*, 735 F.3d 141, 147 (4th Cir. 2013) ("*Simmons* announced a new substantive rule that is retroactive on collateral review."). *Petitioner and the government agree that*, under *Simmons*, *only one of Petitioner's prior convictions constituted a "felony drug offense" for purposes of Section 841(b)(1).* And there is no dispute that—as a result of the Fair Sentencing Act, *Simmons*, and their retroactive application—if Petitioner is resentenced, he will face a mandatory minimum of 120 months' imprisonment and an advisory Guidelines range of 120 to 137 months' imprisonment.

In August 2012, Petitioner filed a successive habeas petition under 28 U.S.C. §§ 2241 and 2255 seeking relief from his sentence. In particular, Petitioner asserted that, in light of *Simmons*, his sentence rested on an improper construction of Section 841(b)(1). Commendably, as acknowledged by another of my colleagues, *the government agreed that Petitioner was entitled to relief under Section 2241 and supported resentencing*. *Surratt v. United States*, No. 3:12-CV-513, 2014 WL 2013328, at *4–7 (W.D.N.C. May 16, 2014). Nonetheless, the district court concluded that Petitioner could not seek to set aside his sentence. *Id.* at *5. In reaching this conclusion, the district court explained that Petitioner could not avail himself of Section 2255's

13

"savings clause," which permits a court to entertain a successive petition under Section 2241 if it "appears that the remedy [available under Section 2255] is inadequate or ineffective to test the legality of his detention," 28 U.S.C. § 2255(e), because we had limited the availability of relief under the savings clause to "situations in which a subsequent change in law makes [a] petitioner's conduct 'non-criminal,'" *Surratt*, 2014 WL 2013328, at \*5 (citing *In re Jones*, 226 F.3d 328 (4th Cir. 2000)). *Simmons* did not call into question the validity of Petitioner's conviction, and therefore the district court reasoned that Petitioner could not seek relief under the savings clause. *Surratt*, 2014 WL 2013328, at \*5.

We agreed, thereby *rejecting the government's argument* that Petitioner was entitled to relief under Section 2241. *United States v. Surratt*, 797 F.3d 240, 253 (4th Cir. 2015), *reh'g en banc granted*, *United States v. Surratt*, No. 14-6851 (Dec. 2, 2015). In dissent, Judge (now Chief Judge) Gregory argued that Petitioner was entitled to seek relief under Section 2241 because his "erroneous life sentence" constituted "a fundamental defect of constitutional proportions." *Id.* at 271 (Gregory, J., dissenting). In particular, Judge Gregory explained that an erroneous mandatory minimum sentence infringes on a defendant's right under the Due Process Clause "to 'be deprived of his liberty only to the extent determined by the [trier of fact] in the exercise of its statutory discretion,'" *id.* at 273 (quoting *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)), and usurps Congress's constitutional responsibility for "defining crimes and fixing penalties," *id.* (quoting *United States v. Evans*, 333 U.S. 483, 486 (1948)).

14

Petitioner moved for rehearing en banc, which we granted, thereby vacating the panel opinion. On March 23, 2016, we reheard argument on Petitioner's appeal, and *the government continued to argue that Petitioner was entitled to invoke Section 2255's savings clause and thereby seek relief under Section 2241.* *See* Gov. Supp. Br. at 13 ("An erroneously imposed mandatory minimum sentence is the type of fundamental defect cognizable under the savings clause.").

On January 19, 2017—nearly 10 months after the rehearing en banc, and still without a decision from us—the President commuted Petitioner's life sentence to a 200-month term of imprisonment. Petitioner's commutation was part of a broader effort by the President to commute the sentences of inmates sentenced in accordance with the severe mandatory minimums and unjust powder-to-crack quantity ratio applicable under the earlier version of Section 841(b)(1). Sari Horwitz, *Obama Grants Final 330 Commutations to Nonviolent Drug Offenders*, Wash. Post (Jan. 19, 2017), https://www.washingtonpost.com/world/national-security/obama-grants-final-330-commutations-to-nonviolent-drug-offenders/2017/01/19/41506468-de5d-11e6-918c-99ede3c8cafa_story.html?utm_term=.dc835df4e164; Ann E. Marimow, *N.C. Man Serving Life for Nonviolent Crime Among Hundreds Granted Early Release*, Wash. Post (Jan. 25, 2017), https://www.washingtonpost.com/local/public-safety/nc-man-wrongly-given-life-sentence-is-among-hundreds-granted-early-release/2017/01/25/f4959cd8-e311-11e6-a453-19ec4b3d09ba_story.html?utm_term=.54519ebcc5c8; Charlie Savage, *Obama Commutes Sentences for 8 in Crack Cocaine Cases*, N.Y. Times, Dec. 19, 2013, at A1.

15

At the time of his commutation, Petitioner had served approximately 140 months of his life sentence. The President's Grant of Commutation "condition[ed] the grant of commutation . . . on [Petitioner] enrolling in the [Residential Drug Abuse Program ("RDAP")] by written agreement, as evidenced by [Petitioner]'s signing, within 14 days of [his] receipt of a certified copy of this document, a receipt verifying his . . . acceptance of the commutation granted with all of its conditions, including enrollment in RDAP." *United States v. Surratt*, No. 14-6851 (4th Cir. Apr. 4, 2017), ECF No. 136, at 8. A letter delivered to Petitioner on January 26, 2017, stated that the commutation was "conditioned on [Petitioner's] enrollment in the [RDAP], which would then be provided to [him] at an appropriate time before [his] prison sentence expires." *Id.* at 15. Neither the Grant of Commutation nor the letter discussed the action pending before us, let alone conditioned the commutation on its dismissal. That same day, Petitioner signed the letter, and thereby "accept[ed] and agree[d] to its conditions, including [his] enrollment in [RDAP]." *Id.* The government has not provided evidence that it has, in fact, enrolled Petitioner in RDAP, nor has the government formally represented that all conditions of the commutation have been satisfied.

Soon after Petitioner accepted the commutation, we sua sponte asked the parties to address whether the commutation mooted Petitioner's collateral attack on his sentence. Apparently, our request arose from taking judicial notice of the news reports of the President's action, because neither party supplemented the record before us to provide information on the commutation. Nonetheless, in response to our sua sponte request, the government argues that Petitioner's action is now moot. Notably—although the

16

government previously took the position that Petitioner was entitled to relief under Section 2241—in its brief addressing mootness, the government now argues that "[t]here is no 'fundamental defect' in [Petitioner]'s current sentence, *see In re Jones*, 226 F.3d 328, 333 n.3 (4th Cir 2000), and the district court would therefore lack jurisdiction to consider his habeas petition under the savings clause in Section 2255(e)." Letter from Jill Westmoreland Rose, U.S. Attorney, to Patricia S. Connor, Clerk, U.S. Court of Appeals for the Fourth Circuit, at 3 n.1 (Feb. 21, 2017), *United States v. Surratt*, No. 14-6851 (4th Cir.) ("Gov. Resp."). The government's statement that Petitioner's "*current* sentence" suffers from "no 'fundamental defect,'" *id.* (emphasis added), indicates that the government *still has not abandoned* its position—held throughout this litigation—that Petitioner's original sentence is unlawful.

## II.

### A.

The mootness doctrine derives from the Constitution's limitation on federal judicial authority to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "The mootness doctrine . . . constitutes a relatively weak constraint on federal judicial power: 'A case becomes moot *only* when it is impossible for a court to grant *any* effectual relief whatever

17

to the prevailing party." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013)

(quoting *Knox v. Serv. Emps. Int'l Union, Local 100*, 132 S. Ct. 2277, 2287 (2012)).

Accordingly, "[a]s long as the parties have a concrete interest, *however small*, in the

outcome of the litigation, the case is not moot." *Knox*, 132 S. Ct. at 2287 (emphasis

added).

Here, there is no dispute that if we vacate Petitioner's commuted sentence and

remand for resentencing, Petitioner will likely face a sentence shorter than that imposed

by the commutation. In particular, whereas the President commuted Petitioner's life

sentence to 200 months' imprisonment, Petitioner's applicable Guidelines range is 120 to

137 months, less than his time-served. Accordingly, Petitioner has a continuing

"concrete interest"—namely, his liberty—in having us vacate his current sentence and

remand for resentencing under the applicable Guidelines.[1] We and other courts have

found arguably substantially less significant interests adequate to preclude mootness.

*See, e.g.*, *Townes v. Jarvis*, 577 F.3d 543, 547 (4th Cir. 2009) (holding that the

petitioner's release from prison did not moot his collateral challenge to his sentence

because a favorable appellate decision could "affect the length of his parole"); *Richards

v. United States*, 212 F.2d 453, 454 (D.C. Cir. 1954) (holding that defendant's collateral

---

[1] Recall that until we requested briefing regarding whether Petitioner's commutation mooted this action, the government supported resentencing Petitioner, meaning that there was no "concrete" adversity between the parties. There is some irony that, to resolve the lack of concrete adversity between Petitioner and the government, we appointed independent counsel to argue that Petitioner should remain in prison for the rest of his life, yet the majority now dismisses Petitioner's action on mootness grounds, notwithstanding that we can still provide Petitioner meaningful relief—namely, his release from prison.

18

challenge to the lower end of his sentencing range was not moot, even though defendant had already served more than that lower end, because "there is some possibility" that having a longer minimum sentence "may in some indirect way affect him adversely in the future").

I am not alone in my view that an injustice continues by declaring this matter now moot. Indeed, the Seventh Circuit, the only circuit that appears to have squarely addressed the issue, refused to find mootness in analogous circumstances, holding that a petitioner may collaterally challenge his original sentence, notwithstanding that the challenged sentence was commuted during the course of litigating that collateral challenge, when the commuted sentence exceeds the mandatory minimum the petitioner would face if he prevailed on his collateral challenge. *See Simpson v. Battaglia*, 458 F.3d 585, 595 (7th Cir. 2006); *Madej v. Briley*, 371 F.3d 898, 899 (7th Cir. 2004). In *Simpson*, for example, after the petitioner filed a habeas petition challenging his death sentence, the Governor of Illinois commuted the petitioner's sentence from death to life imprisonment without parole. 458 F.3d at 595. Like the government does here, the State argued that the commutation rendered the petitioner's collateral challenge to his sentence nonjusticiable, and therefore moot, because of the petitioner's decreased sentence and "the executive nature of his confinement." *Id.* The Seventh Circuit rejected both arguments, explaining that because the petitioner would face a mandatory minimum of 20 years' imprisonment if he prevailed on his collateral attack, as opposed to the life sentence imposed by the Governor, "it [wa]s possible for [the petitioner] to obtain relief, and his sentencing claims [we]re not moot." *Id.* Put differently, "[a] full remedy for the

19

constitutional shortcoming at the original sentencing hearing entails allowing [the petitioner] to seek that lower sentence now." *Id.* (second alteration in original) (quoting *Madej*, 371 F.3d at 899).

Like in *Simpson* and *Madej*, the error in Petitioner's original sentence was of constitutional dimension, as it raised serious separation-of-powers and due process concerns by infringing on Congress's authority to define crimes and punishments, *see United States v. Newbold*, 791 F.3d 455, 460 (4th Cir. 2015), and depriving the sentencing judge of the opportunity to exercise his discretion to impose a just punishment, *see Hicks*, 447 U.S. at 346. Also like in *Simpson* and *Madej*, the President commuted Petitioner's sentence *after* Petitioner filed a collateral challenge to that sentence. And, like in *Simpson* and *Madej*, because Petitioner's conviction under Section 841(b)(1) subjects him, in the event of resentencing, to a mandatory minimum sentence of 120 months' imprisonment—substantially less than the 200-month term imposed by the President—on remand Petitioner can "seek a term lower than the . . . sentence that the [President] substituted for the [sentence of life imprisonment]." *Madej*, 371 F.3d at 899. Accordingly, Petitioner's challenge is not moot, and he is entitled to seek resentencing.

B.

The government nevertheless argues that Petitioner's appeal is moot for four reasons. First, it maintains that "a federal court has no power to alter a sentence that results from an exercise of the President's pardon power." Gov. Resp. at 4; *see also id.* ("Given this plenary power vested in the President, no other branch may alter the effect of a presidential pardon."). Second, it asserts that the Supreme Court's decision in *Schick*

20

*v. Reed*, 419 U.S. 256 (1974), requires dismissal of Petitioner's action. Third, the government maintains that the action is moot because Petitioner is no longer serving the same sentence as that which is the subject of his habeas challenge. Finally, the government suggests that by accepting the commutation, Petitioner waived or forfeited his right to collaterally attack his sentence. I disagree.

1.

The government maintains that federal courts are without power to review a commuted sentence. Gov. Resp. at 4; *see ante* at 4. To be sure, the Constitution vests the President with broad pardon and commutation authority. But neither the Constitution nor the case law establish that "[t]he President's commutation order simply closes the judicial door," as my colleague asserts. *Ante* at 4. On the contrary, the Supreme Court has long held that, in commuting an inmate's sentence, the President may not impose "conditions which . . . in themselves offend the Constitution." *Schick*, 419 U.S. at 264; *see also id.* at 266 (explaining that the Constitution authorizes the President to impose, in commuting a sentence, "conditions which are in themselves constitutionally unobjectionable"). To that end, in deciding whether to grant commutations or in imposing conditions on commutations, the President may not, for example, engage in invidious discrimination. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 292 (1998) (Stevens, J., concurring in part and dissenting part) ("[N]o one would contend that a [chief executive] could ignore the commands of the Equal Protection Clause and use race, religion, or political affiliation as a standard for granting or denying clemency."). Likewise, the President must exercise his commutation authority in accordance with separation-of-

21

powers principles, and therefore may not impose sentences or conditions divorced from those established by Congress, which is constitutionally responsible for "defining crimes and fixing penalties." *Evans*, 333 U.S. at 486; *cf. United States v. Libby*, 495 F. Supp. 2d 49, 55 (D.D.C. 2007) ("[I]t is certainly conceivable that the President, through the exercise of his commutation power, could encroach upon the authority or functions of one of the coordinate branches in a manner that would impermissibly 'offend the Constitution.'" (quoting *Schick*, 419 U.S. at 266)).

Our sister circuits also have recognized that the President's exercise of his pardon and commutation power does not preclude the beneficiary of the pardon or commutation from lodging a collateral attack against his or her underlying conviction. For example, the First Circuit held that a presidential *pardon* granted after a petitioner files for relief from his conviction under Section 2255 does not moot the collateral challenge because a "pardon[] does not relieve [the petitioner] from all the disabilities of a conviction." *Robson v. United States*, 526 F.2d 1145, 1147 (1st Cir. 1975). The Ninth Circuit reached a substantially similar result in *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980). There, the petitioner filed a habeas petition challenging her conviction for bank robbery on grounds that she was denied effective assistance of counsel and due process of law. *Hearst*, 638 F.2d at 1193. While the petition was pending, the President commuted the petitioner's sentence and she was released. *Id.* at 1192 & n.1. Nonetheless, the Ninth Circuit held that the commutation of the petitioner's sentence did not render her habeas action moot. *Id.* ("Although [the petitioner] is no longer in federal custody, this case is not moot. The district court on remand will have the power under § 2255 to vacate [her]

22

conviction, if it finds such relief appropriate." (citation omitted)).  And, most relevantly, the Seventh Circuit has recognized that a petitioner may proceed with collaterally challenging a *subsequently commuted sentence* when, as here, the commuted sentence exceeds the mandatory minimum for the offense.  *See supra* Part II.A (citing *Simpson*, 458 F.3d at 595; *Madej*, 371 F.3d at 899).

Accordingly, contrary to the government's unsupported assertion, federal courts are not categorically precluded from collaterally reviewing sentences imposed under the President's Article II, section 2 powers, and the length of those sentences, in particular. Rather, the relevant question is whether collateral review is appropriate *in this case*.

Here, against his own discomfort regarding the appropriate sentence for Petitioner's offense, Judge Conrad sentenced Petitioner to a term of life imprisonment based on what we later found in *Simmons* to be an error attributable to our decision in *Harp*.  Yet, despite the retroactive application of *Simmons* and the Fair Sentencing Act, Petitioner is currently serving a sentence that exceeds his applicable Guidelines range.  In such circumstances, the separation-of-powers concerns that animate the application of the political question doctrine to presidential pardons and commutations must give way to the judiciary's independent—and compelling—interest in remedying its errors.  That is particularly true when the President's commutation was targeted at correcting an *independent* injustice—here, the statutory sentencing framework for crack offenses that Congress and the President have since concluded was unjust and racially biased— attributable to the political branches.  "[I]f the Great Writ, which has always been 'a bulwark against convictions that violate fundamental fairness,' *Engle v. Isaac*, 456 U.S.

23

107, 126 (1982), is to mean anything at all," Petitioner should be able to pursue collateral relief in such circumstances. *Surratt*, 797 F.3d at 270 (Gregory, J., dissenting) (internal quotation marks omitted).

2.

The government also argues, incorrectly, that the Supreme Court's *Schick* decision requires dismissal of Petitioner's collateral attack on his sentence. In 1954, a court martial convicted the petitioner, Schick, of murdering an eight-year-old girl. 419 U.S. at 257. The petitioner—who was serving overseas in the United States Army at the time of the murder—was sentenced to death under Article 118 of the Uniform Code of Military Justice ("UCMJ"). *Id.* Pursuant to then-applicable law, the case was then forwarded to President Eisenhower for final review and approval of the petitioner's death sentence. *Id.* at 257–58. In 1960, President Eisenhower commuted the petitioner's sentence to a term of life imprisonment on the condition that Petitioner was "barred parole at any time" and dishonorably discharged him from the military. *Id.* at 258. As a result, the petitioner was transferred from military custody to the Federal Penitentiary at Lewisburg, Pennsylvania, where he began serving his newly instituted life sentence. *Id.*

*Twelve years later*, in 1972, the Supreme Court ruled that the death penalty violated the Eighth and Fourteenth Amendments. *Furman v. Georgia*, 408 U.S. 238 (1972). The petitioner then filed a habeas petition seeking to set aside the no-parole condition of his commuted sentence. Arguing that *Furman*'s abolition of the death penalty rendered his original death sentence invalid, the petitioner sought resentencing to a term of life with the possibility of parole, the alternative punishment provided for his

24

crime under the UCMJ. *Schick*, 419 U.S. at 258–59. Rejecting this argument, the Supreme Court ruled that the no-parole condition was lawful when the President imposed it and that *Furman* did not alter the condition's "validity." *Id.* at 268.

*Schick*—which does not mention mootness or justiciability, the theories upon which the government seeks dismissal—is readily distinguishable. As an initial matter, the military justice proceedings giving rise to *Schick* were meaningfully distinct from the Article III proceedings that gave rise to Petitioner's conviction and sentence. Notably, because the Constitution expressly vests Congress—and not the federal courts—with authority over military justice matters, courts have long recognized that the availability of habeas review of military justice matters is unusually narrow. *See, e.g.*, *Burns v. Wilson*, 346 U.S. 137, 139–41 (1953); *see also Schlesinger v. Councilman*, 420 U.S. 738, 746–48 (1975). By contrast, Petitioner's original sentence was imposed by a federal district court applying our precedent (later deemed incorrect), giving the judiciary an institutional interest in remedying that unlawful sentence—an interest not present in *Schick*.

Additionally, the petitioner in *Schick* filed his collateral challenge to his sentence *more than 10 years after* his sentence was commuted. By contrast, Petitioner filed his habeas petition *years before* the President commuted his sentence. And whereas the petitioner in *Schick was not serving* his death sentence when *Furman* abolished the death penalty, Petitioner *was serving* his mandatory life sentence when we decided *Simmons* and made that sentence unlawful. The *Schick* Court found these distinctions meaningful, emphasizing that the "petitioner's death sentence was not pending in 1972 because it had long since been commuted" and, therefore, that it was not "'unfair' that he be treated

25

differently from persons whose death sentences were pending at the time that *Furman* was decided." *Id.* at 259, 268. Accordingly, contrary to the government's position, *Schick* contemplates that inmates, like Petitioner, whose sentences were unlawful at the time they lodged their collateral attack and at the time the President commuted their sentence, should be "treated differently" than inmates, like Schick, whose sentences were lawful when the President offered a commutation.

3.

Third, the government argues that Petitioner's collateral challenge is moot because he is no longer serving the sentence that is the subject of his habeas petition. Yet in commuting a sentence, "the executive has superimposed its mind upon the judgment of the court; but *the sentence remains, nevertheless, the judgment of the court*, and not of the executive, and is subject to the regulations of law respecting its enforcement." *Duehay v. Thompson*, 223 F. 305, 307–08 (9th Cir. 1915) (emphasis added); *see also, e.g.*, *Ricks v. State*, 882 S.W.2d 387, 391 (Tenn. Crim. App. 1994) ("[A] commutation affirms the sentence imposed by the jury or the trial court—it simply modifies this sentence."); *Application of White*, 2 N.Y.S.2d 582, 586 (N.Y. Ct. Cl. 1938) ("[T]he commutation is an affirmance of it [the sentence], with a modification." (internal quotation marks omitted)). Accordingly, Petitioner is still serving his original, unlawful judicial sentence, although "only the unremitted portion of the original sentence may be enforced." *White*, 2 N.Y.S.2d at 586.

And even if a commuted sentence did displace an earlier sentence, Petitioner would be entitled to relief because, unlike in *Schick*, the President determined the

26

duration of the term of Petitioner's commuted sentence against the backdrop of his original, concededly incorrect, sentence.  In particular, the President may have concluded that the 200-month term was appropriate because the district court (wrongly, as we now know) found that Petitioner previously had committed three "felony drug offenses" and therefore deserved harsher punishment.  That Petitioner's commuted sentence exceeds the Guidelines range that was applicable to him at the time of his commutation suggests as much.  Because we cannot be sure that Petitioner's unlawful original sentence did not taint his commuted sentence, Petitioner suffers a continuing injury from that original sentence, an injury that this we can remedy by vacating Petitioner's commuted sentence and remanding for resentencing.

Even if Petitioner's original sentence did not taint his commuted sentence, the commutation does not foreclose the possibility that Petitioner will be held under his original sentence in the future.  When an executive attaches a condition to a pardon or commutation, the pardon or commutation becomes void if the condition is breached.  *See, e.g.*, *Vitale v. Hunter*, 206 F.2d 826, 829 (10th Cir. 1953); *Pippin v. Johnson*, 15 S.E.2d 712, 713 (Ga. 1941); *People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 557 (Ill. 2004); *Crooks v. Sanders*, 115 S.E. 760, 761 (S.C. 1922).  *Vitale* is illustrative.  There, the President commuted the defendant's sentence on the condition that the defendant leave the United States and not return.  206 F.2d at 828.  Law enforcement officers subsequently found the defendant in the United States and returned him to prison to serve the remainder of his original sentence.  *Id.*  The defendant sought habeas relief, which the

27

court denied, explaining that when the defendant violated the terms of his commutation, "the commutation thereupon became *null and void*." *Id.* at 829 (emphasis added).

Here, the President conditioned Petitioner's commutation on his enrollment in a drug rehabilitation program. The materials provided to us by the government regarding Petitioner's commutation do not establish whether the government has in fact enrolled Petitioner in RDAP. If Petitioner fails to satisfy that condition—or if the government takes the position that Petitioner failed to satisfy that condition, and Petitioner is barred from filing a successive petition to challenge the government's conclusion on that point—his commutation will be "null and void," and he will serve out his unlawful life sentence. *Id.* This possibility, "however small," is sufficient to give Petitioner a "concrete interest" in having us vacate that original sentence and remand for resentencing. *Knox*, 132 S. Ct. at 2287. Indeed, to the extent enrollment in RDAP is a condition precedent to the President's commutation taking effect, Petitioner may still be serving his unlawful mandatory life sentence because the government has not provided us with any evidence of Petitioner's enrollment in RDAP.

4.

Finally, the government maintains that Petitioner's action is moot because "[b]y accepting the commutation and its conditions, [Petitioner] 'substituted . . . a lesser punishment than the law [had] imposed upon him, and he cannot complain if the law executes the choice he has made.'" Gov. Resp. at 5 (second and third alterations in

28

original) (quoting *Ex parte Wells*, 59 U.S. 307, 315 (1855)).[2]  Put differently, the government argues that, by accepting the commutation, Petitioner implicitly forfeited or waived his right to collaterally challenge his original sentence, notwithstanding that the errors in his original sentence may have, and likely did, taint his commuted sentence. *See supra* Part II.B.3.

A conditional commutation, like the commutation the President offered to Petitioner, is a private contract between the President and the individual to whom it is tendered. *United States v. Wilson*, 32 U.S. 150, 161 (1833) (Marshall, J.); Annotation, *Conditional Pardon*, 60 A.L.R. 1410 ("[A] conditional pardon is, in form and substance, a contract between the executive . . . and the person to whom it is granted."). To be valid, there must be both "delivery" and "acceptance." *Wilson*, 32 U.S. at 161. Acceptance of a conditional commutation is required because "the condition may be more objectionable than the punishment inflicted by the judgment." *Id.* A conditional commutation, therefore, is somewhat akin to a plea agreement—in return for receiving a reduced sentence, the individual receiving the commutation agrees to abide by the conditions of the commutation.

The Supreme Court has long disfavored the inferred or implicit waiver of rights, particularly constitutional rights, in plea agreements or otherwise. *See Estelle v.*

---

[2] *Wells* does not address, much less support, the government's mootness argument. At issue in *Wells* was whether Article II, section 2 empowers the President to grant conditional pardons. 59 U.S. at 309. *Wells* did not address whether, by accepting a commutation, an individual *implicitly waives* the right to pursue an ongoing collateral challenge to his original sentence that would provide him relief beyond that offered by the President's conditional commutation—the question at issue here.

*Williams*, 425 U.S. 501, 515 (1976) (Powell, J., concurring). To that end, a defendant may waive the right to appeal a sentence only "when the waiver was knowingly and voluntarily made." *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992). Likewise, "the right to attack a sentence collaterally may be waived so long as the waiver is knowing and voluntary." *United States v. Lemaster*, 403 F.3d 216, 220 (4th Cir. 2005).

Here, the President's Grant of Clemency did not expressly condition the commutation of Petitioner's original sentence on his waiver of his right to collaterally attack that sentence. Likewise, the Grant of Clemency did not require that Petitioner dismiss the instant case as a condition of the commutation. There also is no evidence that, before accepting the President's offer of commutation, Petitioner was informed that if he accepted the commutation he would be waiving his right to continue to pursue his challenge to his original sentence and, therefore, foregoing the opportunity to obtain an even shorter sentence than that imposed by the President.

In such circumstances, Petitioner could not have knowingly and voluntarily accepted a waiver of his right to collaterally challenge his sentence as a condition of his commutation. *Cf. United States v. Ortiz-Garcia*, 665 F.3d 279, 284–85 (1st Cir. 2011) (holding that defendant did not knowingly and voluntarily waive his right to appeal when defendant was not "informed . . . of the ramifications of the waiver"); *United States v. Kebreau*, 316 F. App'x 220, 221 (4th Cir. 2008) (holding that defendant's "plea was not knowing and voluntary because the district court failed to adequately advise him of the mandatory minimum sentence he faced"). Indeed, had Petitioner known that he was waiving his right to collaterally challenge his original sentence—and thereby obtain

30

resentencing under the now-applicable Guidelines, which offered the prospect of an even shorter sentence than that offered by the President—he may have rejected the President's commutation on grounds that it included conditions "more objectionable than the punishment inflicted by the judgment." *Wilson*, 32 U.S. at 161.[3]

## IV.

Petitioner's life sentence resulted from an acknowledged error by us and a sentencing law that Congress—at the public's behest—concluded was unjust and racially biased. The President's commutation of Petitioner's sentence, which was intended to address the unjust sentencing framework established by the previous version of Section 841(b)(1), provided Petitioner with only partial relief. But Petitioner's commuted sentence, which the President determined against the backdrop of Petitioner's unlawful original sentence, still exceeds the now-applicable Guidelines range. Notwithstanding its responsibility for (1) Petitioner's unlawful sentence and (2) forcing Petitioner to decide whether to accept the President's commutation without the benefit of a decision from us

---

[3] *Schick*'s statement that "[i]t would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in accepting the commutation which he sought," 419 U.S. at 267, does not undermine this analysis. In particular, when the President commuted the sentence of the petitioner in *Schick*, the death sentence was constitutional and the petitioner did not have a pending collateral challenge. By contrast, Petitioner's commutation was granted after his original sentence was deemed unlawful and during the pendency of his collateral challenge to that sentence. Accordingly, *Schick* did not address whether, by accepting a conditional commutation, the individual to whom the commutation is tendered *implicitly* consents to dismissal of a *pending challenge* to the sentence that the President commuted, even when the commutation is not expressly conditioned on the dismissal of such challenge—the question at issue here.

on the viability of his collateral challenge, the majority dismisses Petitioner's appeal as moot. But "[t]he underlying purpose of [Section] 2255 is to remove the possibility of the survival of an injustice beyond trial and appeal." *United States v. Lewis*, 392 F.2d 440, 443–44 (4th Cir. 1968). It is our duty, therefore, to *fully remedy* Petitioner's unlawful sentence.

V.

In declaring this matter now moot, after years of delay, we do little to enhance the public's confidence and trust in the integrity of the judicial process. The sentence that Raymond Surratt, Jr., a nonviolent drug offender, continues to serve remains a judicial sentence, not a newly created executive sentence. His challenge to that sentence is not moot, and we should no longer delay justice to Mr. Surratt or others like him.

With due regard for my colleagues, I most respectfully dissent.