2023 WI 70

# SUPREME COURT OF WISCONSIN

NOTICE

**This order is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2023AP1399-OA

**Rebecca Clarke, Ruben Anthony, Terry Dawson, Dana Glasstein, Ann Groves-Lloyd, Carl Hujet, Jerry Iverson, Tia Johnson, Angie Kirst, Selika Lawton, Fabian Maldonado, Annemarie McClellan, James McNett, Brittany Muriello, Ela Joosten (Pari) Schils, Nathaniel Slack, Mary Smith-Johnson, Denise Sweet and Gabrielle Young,**

       **Petitioners,**

  **v.**

**Wisconsin Elections Commission, Don Millis, Robert F. Spindell, Jr., Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, Joseph J. Czarnezki in their official capacities as Members of the Wisconsin Election Commission;, Meagan Wolfe in her official capacity as the Administrator of the Wisconsin Elections Commission; Andre Jacque, Tim Carpenter, Rob Hutton, Chris Larson, Devin LeMahieu, Stephen L. Nass, John Jagler, Mark Spreitzer, Howard Marklein, Rachael Cabral-Guevara, Van H. Wanggaard, Jesse L. James, Romaine Robert Quinn, Dianne H. Hesselbein, Cory Tomczyk, Jeff Smith and Chris Kapenga in their official capacities as Members of the Wisconsin Senate,**

      **Respondents,**

**Wisconsin Legislature,**

      **Intervenor-Respondent.**

**FILED**

**OCT 6, 2023**

Samuel A. Christensen
Clerk of Supreme Court
Madison, WI

The Court entered the following order on October 6, 2023:

On August 2, 2023, petitioners Rebecca Clarke, et al., 19 Wisconsin voters, filed a petition for leave to commence an original action under Wis. Stat. § (Rule) 809.70, together with a supporting memorandum, an appendix, and a motion for a scheduling order. The petitioners allege that the state legislative districts adopted by this court in Johnson v. Wisconsin Elections Comm'n, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III)—including the voters' districts—are an unconstitutional extreme partisan gerrymander; violate Article IV, Sections 4 and 5 of the Wisconsin Constitution because the districts do not consist of "contiguous territory;" and violate the Wisconsin Constitution's separation-of-powers doctrine. The petitioners ask that we assume original jurisdiction and, after resolving certain legal questions, declare the existing state legislative districts unconstitutional.

On August 22, 2023, the named respondents in this matter, Wisconsin Elections Commission, et al., filed responses to the original action petition. Several of the respondents, a number of members of the State Senate, oppose the petition, arguing that petitioners' claims are foreclosed by this court's decision in Johnson III and are an unduly delayed collateral attack on that decision. Several additional respondents, also members of the State Senate, support the petition, arguing that petitioners' claims are meritorious. For their part, respondents Wisconsin Elections Commission, its members, and its administrator, take no position on the merits of the petition.

On August 22, 2023, the Wisconsin Legislature filed a motion to intervene as a respondent. No response or opposition to this motion to intervene has been filed.

On August 22, 2023, the Wisconsin Legislature and Professor Charles Fried filed motions for leave to file amicus briefs regarding the petition for original action. No response or opposition to these motions to file amicus briefs has been filed.

This court has long deemed redistricting challenges a proper subject for the court's exercise of its original jurisdiction. See, e.g., Jensen v. Wisconsin Elections Board, 2002 WI 13, ¶17, 249 Wis. 2d 706, 639 N.W.2d 537 ("there is no question" that redistricting actions warrant "this court's original jurisdiction; any reapportionment or redistricting case is, by definition, *publici juris*, implicating the sovereign rights of the people of this state."). This includes challenges to existing district maps. See State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 558, 126

N.W.2d 551 (1964) (resolving challenges to a legislatively enacted map through an original action).

Nevertheless, after considering all of the filings, we decline to grant leave to commence an original action with respect to Issues 1-3 presented in the petition. Although these issues raise important and unresolved questions of statewide significance, the need for extensive fact-finding (if not a full-scale trial) counsels against addressing them at this time. See Jensen, 249 Wis. 2d 706, ¶20. Additionally, the petitioners acknowledge that a decision on Issues 4 and 5 set forth in their petition "could render it unnecessary" to decide Issues 1-3. Accordingly,

IT IS ORDERED that the motions for leave to file non-party briefs, *amici curiae*, are granted, and the accompanying briefs are accepted for filing;

IT IS FURTHER ORDERED that the petition for leave to commence an original action is granted solely as to Issues 4 and 5 set forth in the petition;

IT IS FURTHER ORDERED that the motion for scheduling order is granted to the extent that this order sets forth a schedule for certain proceedings in this case;

IT IS FURTHER ORDERED that the Wisconsin Legislature's motion to intervene is granted. The Legislature's motion is timely; it claims an interest relating to the subject of the action; it is situated such that the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and it has demonstrated that its interests are not adequately represented by the existing parties. See Wis. Stat. § 803.09;

IT IS FURTHER ORDERED that any additional party wishing to intervene in this case must file a motion to intervene, together with a supporting memorandum addressing the requirements of Wis. Stat. § (Rule) 803.09, by October 10, 2023;

IT IS FURTHER ORDERED that the parties may each file a single response to all motions to intervene no later than 4:00 p.m. on October 12, 2023. Each response shall not exceed 25 pages if a monospaced font is used or 5,500 words if a proportional serif font is used;

IT IS FURTHER ORDERED that the parties and the proposed intervenors whose motion to intervene has not yet been decided shall file simultaneous briefs addressing only the following questions:

1.) Do the existing state legislative maps violate the contiguity requirements contained in Article IV, Sections 4 and 5 of the Wisconsin Constitution?

2.) Did the adoption of the existing state legislative maps violate the Wisconsin Constitution's separation of powers?

3.) If the court rules that Wisconsin's existing state legislative maps violate the Wisconsin Constitution for either or both of these reasons and the legislature and the governor then fail to adopt state legislative maps that comply with the Wisconsin Constitution, what standards should guide the court in imposing a remedy for the constitutional violation(s)?

4.) What fact-finding, if any, will be required if the court determines there is a constitutional violation based on the contiguity clauses and/or the separation-of-powers doctrine and the court is required to craft a remedy for the violation? If fact-finding will be required, what process should be used to resolve questions of fact?

IT IS FURTHER ORDERED that each party and each proposed intervenor whose motion to intervene has not yet been decided shall file an initial brief addressing the four questions set forth above on or before 12:00 noon on October 16, 2023, or a statement that no brief will be filed. Each party and each proposed intervenor whose motion to intervene has not yet been decided may file a response brief on or before 12:00 noon on October 30, 2023. The form, length, pagination, appendix, and certification requirements shall be the same as those governing standard appellate briefing in this court for a brief-in-chief and a response brief. See Wis. Stat. § (Rule) 809.19;

IT IS FURTHER ORDERED that any non-party that wishes to file a non-party brief *amicus curiae* addressing the four questions set forth above must file a motion for leave of the court to file a non-party brief pursuant to the requirements of Wis. Stat. § (Rule) 809.19(7). Non-parties should also consult this court's Internal Operating Procedure concerning the nature of non-parties who may be granted leave to file a non-party brief. A proposed non-party brief must accompany the motion for leave to file it. Any proposed

4

non-party brief shall not exceed 20 pages if a monospaced font is used or 4,400 words if a proportional serif font is used. Any motion for leave with the proposed non-party brief attached shall be filed no later than 12:00 noon on November 8, 2023. Any submission by a non-party that does not comply with Wis. Stat. § (Rule) 809.19(7) and any proposed non-party brief for which the court does not grant leave will not be considered by the court;

IT IS FURTHER ORDERED that unless ordered otherwise by a majority of the court, the court will hear oral argument in this matter on Tuesday, November 21, 2023, beginning at 9:45 a.m., in the Supreme Court Hearing Room, 2nd Floor, East Wing of the State Capitol, Madison, Wisconsin. Each party will have 20 minutes of initial oral argument time and an additional 10 minutes for rebuttal. Each party shall have back-up counsel available to argue in the event that the designated attorney(s) cannot appear and present oral argument for any reason on the scheduled oral argument date. Further information regarding oral argument will be provided in subsequent communications from the court or its clerk.

IT IS FURTHER ORDERED that if any party does not wish to participate in oral argument, that party shall file a notice to that effect no later than 12:00 noon on Tuesday, November 7, 2023;

IT IS FURTHER ORDERED that requests for additional briefing or extensions will be viewed with disfavor; and

IT IS FURTHER ORDERED that all Wisconsin attorneys participating in this case must each opt in to this case in the appellate court electronic filing system. All Wisconsin attorneys who are not already opted in for this case are hereby ordered to do so as soon as possible and no later than five days from the date of this order.

ANNETTE KINGSLAND ZIEGLER, C.J. (*dissenting*). This original action is nothing more than a motion for reconsideration of this court's decision in Johnson v. Wisconsin Elections Commission, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559 ("Johnson III"), and appears to have been filed only because of a change in the court's membership. Where does this cycle end? Must this court also allow additional future parties to simply sit this litigation cycle out and come forward next court term—or after the next court election—and present already litigated claims again? What is to stop any party dissatisfied with the outcome here from carrying out challenges ad infinitum, each time from a slightly different angle, until their desired outcome is reached? This litigation chips away at the public's faith in the judiciary as an

5

independent, impartial institution, undermines foundational judicial principles such as stare decisis, and casts a hyper-partisan shadow of judicial bias over the decisions of this court.

Today, my colleagues grant one original action petition and deny another. Specifically, four members of this court vote to grant Clarke v. Wisconsin Elections Commission, No. 2023AP1399-OA, and deny Wright v. Wisconsin Elections Commission, No. 2023AP1412-OA. I concur in Wright and dissent in Clarke because we should not accept either of these cases. Our court just decided redistricting last year in Johnson III. Redistricting should not be an annual event. Redistricting is a process that, under our state constitution, is only supposed to occur once every decade.[1] However, redistricting was required by this court nearly two years ago because the Governor vetoed the maps drawn by the Legislature, creating an impasse. Absent court action, Wisconsin would have been in a constitutional crisis: Wisconsin would have had no maps in place to conduct state and federal elections. Thus, the court, as the final arbiter, was required to act. We clearly are not in that constitutional predicament today.

The congressional map selected by the court was submitted by Democrats, specifically Governor Evers. The state legislative maps ultimately selected by the court were submitted by Republicans, specifically the Wisconsin Legislature. However, the selection of the current state legislative maps occurred only after the United States Supreme Court summarily reversed my colleagues' original selection of Governor Evers' state legislative maps because the Governor's maps violated the Voting Rights Act. Johnson v. Wis. Elections Comm'n, 2022 WI 14, 400 Wis. 2d 626, 971 N.W.2d 402 ("Johnson II"), summarily rev'd sub. nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398 (2022) (per curiam). The issues presented in these original actions have already been decided by this court. The court, acting within its limited role to "answer legal questions," adopted maps that it decided were constitutional as a judicial remedy for an undisputedly unconstitutional situation (the previous district maps no longer matched the geographic distribution of Wisconsin's citizens). This judicial remedy of court-adopted maps stands for the next ten years, absent the enactment of new constitutionally compliant maps by the Legislature and the Governor.

---

[1] "At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants." Wis. Const. art. IV, § 3.

6

I dissent to the order granting the original action petition filed in Clarke because it appears to be evidence of a partisan and political, rather than a reasoned and restrained, approach, and thus departs from the constitutional role of the judiciary. Some may prefer that other maps be drawn. And now, it seems, there is a pre-ordained plan to accomplish that goal. However, I urge my colleagues to exercise judicial restraint here rather than give in to the temptation to exercise raw, political, partisan power.

In granting Clarke, four of my colleagues accept only two of the five issues presented.[2] Those same colleagues add two additional questions to the list of questions to be answered in briefing, two additional questions that are, at best, curious.[3] Why is this? We do not know. These orders are devoid of any stated rationale. Hiding their rationale from the public is far from being transparent and accountable. The Clarke petitioners presented these five issues:

> 1. Whether the state legislative redistricting plans proposed by the Legislature and imposed by this Court in [Johnson III], are extreme partisan gerrymanders that violate Article I, Section 1 of the Wisconsin Constitution's guarantee of equal protection

---

[2] The petitioners in Clarke and in Wright raise almost precisely the same issues and ask for precisely the same relief. Why not accept both cases, consolidate them, or hold one in abeyance? In certain respects, Wright has more complete pleadings.

[3] The court majority has added the following questions to be answered in briefing:

> If the court rules that Wisconsin's existing state legislative maps violate the Wisconsin Constitution for either or both of these reasons and the legislature and the governor then fail to adopt state legislative maps that comply with the Wisconsin Constitution, what standards should guide the court in imposing a remedy for the constitutional violation(s)?; and

> What fact-finding, if any, will be required if the court determines there is a constitutional violation based on the contiguity clauses and/or the separation of powers doctrine and the court is required to craft a remedy for the violation? If fact-finding will be required, what process should be used to resolve questions of fact?

7

under law; and whether this cause of action is justiciable in Wisconsin courts.

2. Whether the state legislative redistricting plans proposed by the Legislature and imposed by this Court in Johnson III are extreme partisan gerrymanders that retaliate against voters based on their viewpoint and exercise of free speech and abridge the ability of voters with disfavored political views to associate with others to advance their political beliefs in violation of Article I, Sections 3 and 4 of the Wisconsin Constitution; and whether these causes of action are justiciable in Wisconsin courts.

3. Whether the state legislative redistricting plans proposed by the Legislature and imposed by this Court in Johnson III are extreme partisan gerrymanders that fail to "adhere[] to justice, moderation, temperance, frugality, and virtue, . . . [and] fundamental principles" in violation of Article I, Section 22 of the Wisconsin Constitution; and whether this cause of action is justiciable in Wisconsin courts.

4. Whether the state legislative redistricting plans proposed by the Legislature and imposed by this Court in Johnson III violate the requirement of Article IV, Sections 4 and 5 of the Wisconsin Constitution that legislators be elected from districts consisting of "contiguous territory."

5. Whether the state legislative redistricting plans proposed by the Legislature and imposed by this Court in Johnson III violate the separation-of-powers principle inherent in the Constitution's division of legislative, executive, and judicial power by usurping the Governor's core constitutional power to veto legislation and the Legislature's core constitutional power to override such a veto.

Four members of this court seemingly attempt to evade several fatal flaws by accepting only two of the five issues presented, namely, the issues relating to contiguity and separation of powers. I suspect the court's focus will be on contiguity even though that issue was already considered and decided in the Johnson litigation. Johnson III, 401 Wis. 2d 198, ¶70 ("The Legislature has satisfied the remainder of Wisconsin's constitutional requirements. The assembly districts are contiguous and sufficiently compact."). Accepting this case primarily, if not solely on contiguity, leads

8

one to conclude that four of my colleagues may already know the result they wish to obtain. Moreover, one of the issues added by the court has already been answered in the Johnson litigation with the court's unambiguous conclusion that the "least change" standard applies. Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶¶64-79, 399 Wis. 2d 623, 967 N.W.2d 469 ("Johnson I"). The second added issue regarding fact-finding is not needed for the questions of law presented in the two accepted issues, but if fact-finding were somehow necessary, which is quite unclear, we are not a fact-finding court. The decision to accept the original action petition in Clarke is a travesty which disregards our very recently decided Johnson litigation and completely ignores longstanding, sound legal principles and the precedent that binds the court.

Do my colleagues refuse to accept the other issues or the petition in Wright because they know this court has already decided these matters? Or is it because most of the petitioners in Wright were allowed to intervene in the Johnson litigation? Typically, this court accepts all issues for review before determining which of those issues are necessary to resolve the case. I suspect my four colleagues may have tried to narrow the issues at the outset to be able to better achieve the pre-determined outcome they desire. But will the remedy they seek invoke the other issues not accepted for review, missing the benefit of briefing or argument? Petitioners appear to be raising the contiguity argument as a means to indirectly re-litigate the already litigated and decided issues of political fairness and political gerrymandering. But, the four in the majority did not accept those issues so they are not before the court. This court is asked to consider "partisan fairness" in overturning the current apportionment maps, as the parties claim that "the current legislative maps are extreme partisan gerrymanders." But these issues are not before the court, and this court already addressed the issue of partisan fairness in Johnson I, determining that it was not the court's role to answer political questions such as claims of partisan fairness, but only to answer "legal" questions such as whether the proposed maps "satisfy all constitutional and statutory requirements". Johnson I, 399 Wis. 2d 623, ¶4. As these issues have already been expressly decided, we should not be resolving them again here.

Perhaps another answer why four members of this court would limit its selection of issues to contiguity and separation of powers could be an attempt to dodge appellate review. When four members of the judicial branch decide they also serve as members of the legislative and executive branches, should they not at least subject themselves to further appellate scrutiny? Yet, the limited issues the four justices accept seem to seek evasion of any such

9

scrutiny. However, any remedy imposed might nonetheless be subject to review. Typically, we take all the issues presented even if the court does not need to decide them because at its inception, we do not know the matter well enough. We need extensive legal research, briefing and argument. This time around seems different: it seems the four justices find that standard procedure unnecessary, as they already appear to know they do not need to fully research and hear all of the issues and arguments presented. Instead, it seems the four justices only accept the two questions of law in order to avoid having the case proceed through traditional fact finding at the trial court.

Notably, these justices vociferously dissented when the court decided Johnson III, a redistricting action, last year. They primarily objected because there was no fact-finding. Johnson III, 401 Wis. 2d 198, ¶161 (Karofsky, J., dissenting). This case, with all of its issues, could have proceeded and facts could have been fully developed in the courts below, but since it now appears that they have changed their view and abandoned their objection once they became a majority of the court, perhaps a thorough process is not what they now desire. It is worth wondering whether this case would withstand a full vetting based upon developed facts and law. Unlike the Johnson litigation, where the court was required to act within a short time frame and remedy a constitutional violation by adopting new maps, these original actions do not pose a situation where the state is without constitutionally compliant maps absent court action. There is no urgency to act with such haste and without a thorough vetting. It is also not urgent to act before the Legislature has decided whether they should proceed with implementing a plan which mirrors Iowa's.[4] Why does the court wish to act with such haste when the Constitution clearly vests redistricting powers within the province of the Legislature and Governor? This hastiness also portends that this case is decided almost before it has begun.

---

[4] Claire Reid, Robin Vos proposed 'Iowa-style' redistricting for Wisconsin. What does that mean? Milwaukee Journal Sentinel, (Sept. 13, 2023); https://www.jsonline.com/story/news/politics/2023/09/13/wisconsin-redistricting-what-is-iowa-style-model-proposed-by-vos/70840624007/; Andrew Bahl, Is Iowa-style redistricting in Wisconsin's future? The Cap Times, (Sept. 13, 2023), https://captimes.com/news/is-iowa-style-redistricting-in-wisconsin-s-future/article_49c8e042-526f-11ee-ad2f-2fdd42d8bb17.html

All of this question-raising behavior seems to demonstrate not prudential judicial reasoning, but rather a sheer will to expedite a preconceived determination to ensure that all maps are favorable to a particular constituency. When a court already knows the answer, the procedures in advance of that decision are nothing more than judicial window dressing. This order seems to bear the hallmarks of just that.

Far from being "judicial window-dressing," the court's reliance on foundational legal principles also supports the fact that both petitions should be denied because the Johnson III decision is the law. Under the doctrines of stare decisis,[5] issue

---

[5] The doctrine of stare decisis bars parties from seeking to overrule recently decided cases such as Johnson III. See State v. Alan Johnson, 2023 WI 39, ¶19, 407 Wis. 2d 195, 990 N.W.2d 174 ("[W]e require a special justification in order to overturn our precedent."); Hinrichs v. DOW Chemical Co., 2020 WI 2, ¶¶66-67, 389 Wis. 2d 669, 937 N.W.2d 37 ("Second, the doctrine of stare decisis militates against the precipitous change in the law that Dow seeks. Stare decisis is fundamental to the rule of law. Indeed, '[t]his court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law.' 'Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise in judicial will, with arbitrary and unpredictable results.' Accordingly, any departure from stare decisis requires 'special justification.'" (citations and footnotes omitted)).

11

preclusion,[6] claim preclusion,[7] and the law of the case,[8] the Johnson III decision stands. Cases that have been decided with finality are not re-litigated. During the Johnson litigation addressing this issue of redistricting maps, we liberally permitted any and all parties to intervene in the case. We then "granted intervention to all parties that sought it." Johnson II, 400 Wis. 2d 626, ¶2. While the respondents were parties to the previous litigation, the Clarke petitioners apparently chose not to participate or at a minimum made no attempt to formally do so.[9]

---

[6] The doctrine of issue preclusion clearly bars the parties from re-litigating what was already decided in the Johnson litigation. See Aldrich v. LIRC, 2012 WI 53, ¶88, 341 Wis. 2d 36, 814 N.W.2d 433 ("The doctrine of issue preclusion . . . is designed to limit the re-litigation of issues that have been actually litigated in a previous action.")

[7] The doctrine of claim preclusion bars parties from bringing claims now which could have been brought in the Johnson litigation. See Dostal v. Strand, 2023 WI 6, ¶24, 405 Wis. 2d 572, 948 N.W.2d 382 ("[C]laim preclusion . . . extends to all claims that either were or could have been asserted in the previous case.").

[8] The doctrine of law of the case, in the interest of there being finality in court decisions, binds the parties in any subsequent retrial or appeal involving the same case and substantially the same facts as was addressed in the Johnson litigation. See State v. Moeck, 2005 WI 57, ¶18, 280 Wis. 2d 277, 695 N.W.2d 783 (The law of the case doctrine is a "longstanding rule that a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal.").

[9] Notably, although the Clarke petitioners were not themselves parties in the Johnson litigation, they are represented in this case by many of the same law firms and lawyers who represented other parties in Johnson. Specifically, Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, and Rebecca Alwin were parties in the Johnson litigation and were represented by Law Forward, Inc.; Stafford Rosenbaum LLP; and the Campaign Legal Center. Those same law firms, with only the addition of a few additional out-of-state lawyers, now represent the petitioners in the Clarke case, creating the appearance that the lawyers have simply substituted a new group of parties to continue the redistricting litigation they could not resolve to their satisfaction in the Johnson litigation.

The law requires them to live with that decision. Reframing arguments or attempting new fact-finding nonexistent in the previous litigation but involving the same maps should not be allowed to prevail. Were that an acceptable tactic, there would be no finality in the law or litigation. "If at first you don't succeed, try, try again" may be a good maxim for children, but that has never been the case for fully vetted, fully litigated and decided cases. If these parties believed that these considerations were fundamental to map determinations, the time for participation was during the Johnson litigation. That time has now passed. This court should not re-litigate the exact same maps one year later, with no intervening change in the law or facts presented. At most, we see a motion for reconsideration; but in this case, such a motion is long since time barred. Wis. Stat. § (Rule) 809.64 ("A party may seek reconsideration of the judgment or opinion of the supreme court by filing a motion under s. 809.14 for reconsideration within 20 days after the date of the decision of the supreme court."). There is no other legal basis or procedural mechanism for this court to once again re-examine these maps.

Moreover, the petitioners' claim that the court's decision in Johnson III violated separation of powers does not seem to warrant serious review. In the Johnson litigation, there had to be new redistricting maps; the maps enacted following the 2010 census were undeniably unconstitutional following the 2020 United States Census. The Legislature and the Governor, the branches constitutionally responsible for redistricting, exercised their constitutional authority in a way that resulted in an impasse. Since the impasse meant that there was a lack of constitutionally

---

In addition, the seven Wright petitioners include five individuals who already participated in the Johnson litigation as parties—a group referred to in the Johnson decisions as the "Citizen Mathematicians and Scientists": Stephen Joseph Wright (Chair of the Department of Computer Sciences at the University Wisconsin-Madison); Gary Krenz (Professor Emeritus of Mathematical and Statistical Sciences and Adjunct Professor of Computer Science at Marquette University); Sarah J. Hamilton (Associate Professor of Mathematics at Marquette University and an Assistant Adjunct Professor at the Medical College of Wisconsin); Jean-Luc Thiffeault (Chair of the Department of Mathematics and a Professor of Applied Mathematics at the University Wisconsin-Madison); and Somesh Jha (Professor of Computer Sciences at the University Wisconsin-Madison). The Wright petitioners are represented by the same attorneys who represented the Citizen Mathematicians and Scientists in the Johnson litigation.

13

required maps in place prior to holding the next partisan election, the judicial branch was forced to intervene, albeit in a limited fashion. We were forced to proceed with a judicial proceeding in the Johnson litigation to select constitutionally compliant maps as a remedy for the ongoing constitutional violation.

It will be interesting to see how the separation-of-powers argument is presented. Seemingly, the argument is that by adopting legislative maps submitted by one party (i.e., the Legislature), this court violated the separation of powers because the Governor had previously vetoed those maps as part of the legislative process. Would not the argument that the court violated the separation of powers by "judicially overriding" the Governor's veto of those maps also require finding that this court violated separation of powers by choosing the Governor's proposed congressional maps over the Legislature's proposed congressional maps? Why does that scenario not also infringe on the Legislature's constitutional authority to enact new district maps? Indeed, the congressional maps proposed by the Governor and adopted by this court in Johnson II are still in effect. If the petitioners' separation-of-powers claims have legal merit, should we also be reviewing the Governor's congressional maps to address that same violation? We shall see. My guess is that the majority will not say much about separation of powers.

The petitioners advance the proposition that Clarke raises issues no different than cases recently decided from other states. No other state in the nation is doing or has done what the petitioners ask this court to do. None of those cases align with the procedural posture of the Johnson litigation and this new case. None of the other state cases the parties cited[10] involve asking a state supreme court to reconsider maps that court adopted as constitutional just one year prior. Moreover, Wisconsin, unlike the states upon which the parties rely, constitutionally vests both its legislature and its governor with the constitutional duty

---

[10] Szeliga v. Lamone, C-02-CV-21-001816, 2022 WL 2132194 (Md. Cir. Ct. Mar. 25, 2022); League of Women Voters of Utah v. Utah Legislature, No. 220901712 (Utah 3d Dist. Ct. Nov. 22, 2022); Republican Party of New Mexico v. Oliver, No. S-1-SC-39481 (N.M. July 5, 2023); Avalos v. Davidson, No. 01CV2897, 2002 WL 1895406 (D. Colo. Jan. 25, 2002); Balderas v. Texas, No. 6:01CV158, 2001 WL 36403750 (E.D. Tex. 2001).

14

to determine redistricting.[11] Wisconsin's unique procedural events in the Johnson litigation have not been replicated in these other states.[12]

All of these factors, when considered together, seem to lead to the reasonable conclusion that accepting this original action is a purely political action to achieve a desired outcome. Despite this court having just declared that the existing maps are constitutional, four members of this court nonetheless accept the original action petition in Clarke. At the same time, four members of this court attempt to evade judicial review by selecting only

---

[11] In the states the parties cited to, the individuals constitutionally responsible for redistricting are: Maryland: the governor (M.D. Const. art. III, §V); Utah: Utah Legislative Redistricting Committee and the Utah Independent Redistricting Commission (Utah Const. art. IX, §1); New Mexico: the legislature (N.M. Const. art. VI, § 16); Colorado: independent commission as of 2018 (Colo. Const. art. V, §§ 44-48); and Texas: the legislature, and if they fail to do so, the legislative redistricting board (Tex. Const. art. III, §28).

[12] In Maryland, the suit challenged a legislative-drawn map enacted over gubernatorial veto: the court ordered the legislature to adopt a revised map, which the legislature did, and which the governor then subsequently signed into law. In Utah, the suit arose after the legislature adopted its own map over the three maps created and proposed by the Independent Redistricting Committee: the trial court declined to dismiss the plaintiff's partisan gerrymandering claims and the Utah State Supreme Court heard oral arguments in July 2023. The New Mexico Supreme Court, unlike the Wisconsin Supreme Court, determined that partisan gerrymandering claims were in fact justiciable. Whereas the Wisconsin Supreme Court adopted a map following a political impasse between its legislature and governor, in Colorado, the State District Court drew its own congressional map following the General Assembly's failure to pass a congressional redistricting plan in time for the 2002 elections. After the Republican-led legislature attempted to replace that court-drawn map, the Colorado Supreme Court ruled that the constitution allowed only one round of congressional redistricting after each 10-year census. And finally, in Texas, after the state failed to produce a congressional redistricting plan, the federal district court drew its own redistricting plan according to various neutral districting factors. In none of these other states did their state supreme court draw the maps or overturn maps which they had adopted as a judicial remedy a year prior. See supra n.10.

15

two of the five issues presented. These are questions of law, yet those justices nonetheless inquire about fact finding and also ask a question which telegraphs that they are poised to overturn the "least change" determination made in Johnson I. 399 Wis. 2d 623, ¶¶64-79. Despite this evasive framing of the case, Caperton nonetheless looms large and will remain a cloud over this outwardly handpicked, predetermined, and preordained litigation.[13]

Finally, the Wisconsin Elections Commission does not seem to be a party that is taking a position. The petitioners' requested remedy affects 17 senators in odd-numbered districts. These senators are named parties in Clarke. But each Senate district has within it three Assembly seats, so there are potentially far-reaching ramifications for seats in the Assembly. Why not name those in the Assembly as well? If the result of the Johnson III maps being declared unconstitutional is that senators in odd-numbered districts lack authority to hold their seats, then does the same lack of authority apply to members of the Assembly?

Upon closer inspection, this original action appears to be nothing more than a thinly-veiled motion for reconsideration of this court's decision in Johnson III. This court should not accept the petition in Clarke. In granting the petition in Clarke, four members of this court have chosen to chip away at the public's faith in the judiciary as an independent impartial institution, undermine foundational judicial principles such as stare decisis, and cast a hyper-partisan shadow of judicial bias over the decisions of this court. Such short-sighted behavior demonstrates the court majority's sheer will to expedite a preconceived outcome for a particular constituency. This abandonment of their judicial oath is disappointing. I dissent.

I am authorized to state that Justices REBECCA GRASSL BRADLEY and BRIAN HAGEDORN join this dissent.

---

[13] The public's faith in the judiciary as an independent, impartial institution is upended when parties are allowed to "[pick] the judge in [their] own case." Williams v. Pennsylvania, 579 U.S. 1, 8-9 (2016). Where parties are allowed to pick who presides over their cases, a specter of judicial bias violates parties' due process rights and invalidates the outcome. Parties can give the impression that they have impermissibly "picked the judge in their own case" through donating overwhelmingly to the campaign of a judge they hope to have preside over their case. See Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009).

REBECCA GRASSL BRADLEY, J.   (*dissenting*).

"Herald, read the accusation!" said the King.

On this the White Rabbit blew three blasts on the trumpet, and then unrolled the parchment scroll, and read as follows:—

"The Queen of Hearts, she made some tarts,
     All on a summer day:
The Knave of Hearts, he stole those tarts,
     And took them quite away!"

"Consider your verdict," the King said to the jury.

"Not yet, not yet!" the Rabbit hastily interrupted. "There's a great deal to come before that!"

                              ***

"No, no!" said the Queen.  "Sentence first—verdict afterwards."

Lewis Carroll, Alice's Adventures in Wonderland 165-67, 187 (1865).

A great deal came before the majority's decision to grant the petitioners this additional kick at the cat.  Ironically, an election for the office of supreme court justice makes possible this purely political proceeding—unconvincingly masquerading as a "judicial" one.  Janet Protasiewicz and Jill Karofsky delivered their sentence first—"Rigged!"—and will form a majority with Ann Walsh Bradley and Rebecca Dallet to shift legislative power from Republicans and bestow an electoral advantage on Democrats, fulfilling one of Protasiewicz's many promises to the principal funder of her campaign, the Democratic Party of Wisconsin.  At least the King in Alice's Adventures in Wonderland wouldn't have wasted time on a show trial contaminated with copious conflicts of interest.  Protasiewicz campaigned on "restoring democracy"[14] and the other members of the majority regularly rail against imaginary threats to democracy.  See, e.g., Teigen v. WEC, 2022 WI 64, ¶208,

_____

[14] Janet Protasiewicz (@janetforjustice), Twitter (Mar. 7, 2023,                  2:21                  PM) https://twitter.com/janetforjustice/status/1633201166929592320?cxt=HHwWgIC8md3zpaotAAAA.

17

403 Wis. 2d 607, 725, 976 N.W.2d 519, 577 (Ann Walsh Bradley, J., dissenting), reconsideration denied, 2022 WI 104. It is hard to imagine a more brazen assault on democracy than removing duly elected senators from office by judicial fiat.

## I. Down the Rabbit Hole

Petitioners are late to the redistricting tea party, which started in 2021 and concluded in 2022. After each decennial census conducted under the United States Constitution, the Wisconsin Constitution requires the legislature "to apportion and district anew the members of the senate and assembly, according to the number of inhabitants." Wis. Const. art. IV, § 3; see Johnson v. WEC, 2021 WI 87, ¶1, 399 Wis. 2d 623, 967 N.W.2d 469 (Johnson I). In 2021, the Wisconsin Legislature drew and passed new maps, but the governor vetoed them. Johnson I, 399 Wis. 2d 623, ¶2. The then-existing maps, enacted into law in 2011, were unconstitutional because shifts in Wisconsin's population "disturbed the constitutionally guaranteed equality of the people's representation in the state legislature." Id. In the face of political impasse, this court was asked to provide a remedy for that inequality. Id. We did so, initially selecting the legislative maps proposed by Governor Evers. See Johnson v. WEC, 2022 WI 14, ¶10, 400 Wis. 2d 626, 971 N.W.2d 402 (Johnson II). The United States Supreme Court summarily reversed because a majority of this court improperly applied the constitutional guarantee of equal protection in its selection of the Governor's maps, which sorted voters based on race without constitutionally permissible justification. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 406 (2022) (per curiam).[15] On remand, this court selected maps drawn by the Wisconsin Legislature. See Johnson v. WEC, 2022 WI 19, ¶3, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III). The remedial maps adopted by this court "would be in effect only 'until such time as the legislature and governor

_____

[15] In a startling confession of ignorance, Rebecca Dallet revealed on a podcast her inability to understand the United States Supreme Court's equal protection jurisprudence: "[T]he Supreme Court said, 'Sorry this [sic] maps, the governor's maps violate the Equal Protection Clause' and they reversed and remanded to us. . . . I've read [the Supreme Court decision] numerous times and I don't understand it analytically[.]" Justice Rebecca Dallet, The Supreme Importance of Wisconsin's Election, Strict Scrutiny (Apr. 3, 2023) (28:56-29:58), https://open.spotify.com/episode/0Ijqvbr52tuszDRB3lGGgQ?si=NPOfV N72TZiv6iYYKSqL6A.

have enacted a valid legislative apportionment plan.'" Johnson I, 399 Wis. 2d 623, ¶19 (quoting State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 606, 128 N.W.2d 16 (1964) (per curiam)).

## II. The Pool of Tears

Redistricting litigation concluded—or at least it should have—in April 2022, with this court's selection of new maps as a remedy for malapportionment. Thereafter, state legislative elections occurred under those maps. At a January 9, 2023 candidate forum, Protasiewicz abandoned universal judicial ethics to unequivocally declare her position on the matter now before this court: "So let's be clear here. The maps are rigged—bottom line. Absolutely, positively rigged. They do not reflect the people in the state. They are rigged, period." She continued, "I believe the gerrymandering decision was wrong. As I indicated to you before, I can't ever tell you what I would do on a particular case, but I can tell you my values and common sense tell you that it's wrong."[16] Calling her preferred case outcomes her "values" does not alleviate the ethical dilemmas underlying Protasiewicz's involvement with this case.

The Democratic Party of Wisconsin invested nearly $10,000,000 in Protasiewicz's successful campaign.[17] One day after her term began, Petitioners—all Democrats—filed this petition. Overturning precedent to strip duly elected Republicans of their seats and deliver them to Democrats reeks of a quid pro quo. Rebecca Dallet foreshadowed this very case: "Big-money special interests have taken over. Justices refuse to recuse themselves even when their

---

[16] Zac Schultz, Candidates Tangle over Political Issues, Judicial Perspectives at First 2023 Wisconsin Supreme Court Forum, PBS Wis. (Jan. 10, 2023), https://pbswisconsin.org/news-item/candidates-tangle-over-political-issues-judicial-perspectives-at-first-2023-wisconsin-supreme-court-forum/.

[17] WisPolitics Tracks $56 Million in Spending on Wisconsin Supreme Court Race, WisPolitics (July 19, 2023), https://www.wispolitics.com/2023/wispolitics-tracks-56-million-inspending-on-wisconsin-supreme-court-race/.

19

donors—who've given massive amounts of money—want the court to rule a certain way."[18] Indeed.

Along with her pro-abortion platform, Protasiewicz showcased her commitment to "fair" maps (whatever that might mean in her subjective opinion), announcing she would "enjoy taking a fresh look at the gerrymandering question."[19] Protasiewicz acknowledged the issue would come before the court should she win the election: "I would anticipate that at some point, we'll be looking at those maps."[20] Protasiewicz went so far as to signal how she would rule after her "fresh look" at the maps: "If you look at the dissent in that maps case, that dissent is what I will tell you I agree with."[21]

Failing to grasp the indispensability of impartiality in the exercise of judicial functions, Protasiewicz divulged, "I think that everybody knows that anybody running for any type of office has their [sic] own personal opinions and their [sic] own personal values. And the question is, do you want to hide those opinions and those values from the public? Are they entitled to know what your personal feelings are? I mean, we've all got them. So the question is, do we hide them? Or do we let the public know?"[22] Protasiewicz chose her campaign strategy, but Wisconsin's Code of Judicial Conduct prohibits judges from engaging in extra-judicial activities which "[c]ast reasonable doubt on the judge's capacity to act impartially as a judge." SCR 60.05(1)(a). Protasiewicz's

---

[18] Judge Rebecca Dallet, Judge Rebecca Dallet: We Need to Fix Our Broken Wisconsin Supreme Court, The Cap Times (Feb. 13, 2018), https://captimes.com/opinion/column/judge-rebecca-dallet-we-need-to-fix-our-broken-wisconsin-supreme-court/article_3851d423-bec8-5b34-bebc-4866cca7da3f.html.

[19] Jessie Opoien & Jack Kelly, Protasiewicz Would 'Enjoy Taking a Fresh Look' at Wisconsin Voting Maps, The Cap Times (Mar. 2, 2023), https://captimes.com/news/government/protasiewicz-would-enjoy-taking-a-fresh-look-at-wisconsin-voting-maps/article_d07fbe12-79e6-5c78-a702-3de7b444b332.html.

[20] Id.

[21] Henry Redman, Supreme Court Candidates Accuse Each Other of Lying, Extremism in Sole Debate, Wis. Exam'r (Mar. 21, 2023), https://wisconsinexaminer.com/2023/03/21/supreme-court-candidates-accuse-each-other-of-lying-extremism-in-sole-debate/

[22] Opoien & Kelly, supra note 6.

"I can't tell you how I would rule on a case" smokescreen does not insulate her declarations from a due process challenge; no reasonable person familiar with her campaign statements would expect her to rule other than according to the "values" she explicitly professed. No reasonable person would believe Protasiewicz can remain fair and impartial in this original action.

Rebecca Dallet once recognized the corrosive effect of judicial candidates opining on issues the court may be called upon to decide: "But as a judge, I don't take positions on specific issues that might come before the court. It's wrong to do so. When judges take positions on issues, they call into question the fairness of the courts. Explicit partisan bias harms our system of justice."[23]

These common-sense principles are not unique to Wisconsin. Then-Chief Justice Ronald M. George of the California Supreme Court explained, "when a candidate for judicial office speaks during an election campaign about his or her views on issues that may come before the court, voters reasonably will anticipate that he or she will render decisions in accordance with those personal views[.]" Ronald M. George, Foreword: Achieving Impartiality in State Courts, 97 Cal. L. Rev. 1853, 1861 (2009). "The inclusion of a judge's personal views among the criteria for judicial election encourages a process of adjudication that is neither independent nor impartial." Id. at 1862. And it may violate litigants' constitutional rights.

While Protasiewicz may have a First Amendment right to say whatever she thinks will get her elected, parties with cases before this court have a Fourteenth Amendment right to impartial arbiters of the law. Would any party defending the maps adopted as this court's remedy in Johnson III have any confidence in receiving an unbiased decision after repeatedly hearing Protasiewicz's "personal opinions" and "personal values" about the maps, or after reading the following social media post:[24]

---

[23] Dallet, supra note 5.

[24] Protasiewicz, supra note 1.

21



While judicial candidates cannot control what third parties (much less Hollywood elites) say about them, candidates have absolute control over what they repost on social media. Wisconsin's Code of Judicial Conduct governs such statements: "A judge, judge-elect, or candidate for judicial office shall not make or permit or authorize others to make on . . . her behalf, with respect to cases, controversies, or issues that are likely to come before the court, pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of the office."  SCR 60.06(3)(b). The First Amendment may permit Protasiewicz to "air" her "grievances," but retweeting Julia Louis-Dreyfus' inducement to vote for Protasiewicz in order

to "win" "[f]air maps" and "[a]bortion rights" and "[c]ontrol of Congress" reflects Protasiewicz's commitment to voting in favor of those outcomes irrespective of the law. Protasiewicz's failure to recuse from this case despite her blatant bias should be reviewed by the United States Supreme Court before Wisconsin taxpayers are forced to foot the bill for a redistricting do-over. The reverberations of Protasiewicz's choice to exercise her First Amendment right at the expense of judicial impartiality extend beyond Wisconsin. Judicial candidates nationwide may replicate Protasiewicz's successful but ethically compromised playbook until the Court curbs the tactic. "The judicial process works only when it is done in a disinterested manner, which is inconsistent with campaigns in which judges commit to rule, or appear to commit to rule, in a certain way in certain cases." Carey v. Wolnitzek, 614 F.3d 189, 193 (6th Cir. 2010).

In Caperton v. Massey, the United States Supreme Court decided due process required a state supreme court justice's recusal from a case because "'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" based in no small part on $3 million dollars in donations from the chairman and principal officer of a party to the action, to a political organization formed to support the justice who would hear the case after his election. 556 U.S. 868, 877, 884 (2009) (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)). Consistent with universal judicial ethics, the justice in Caperton had not made any statements during his campaign suggesting he had prejudged the case. See id. at 882. Nevertheless, the Court determined the justice's participation violated the Due Process Clause because the campaign spending, coupled with its temporal proximity to the case, presented "a serious, objective risk of actual bias." Id. at 886. This court adopted the Caperton test, holding that a circuit court judge's repeated social media interactions with a litigant in a contested paternity case pending before the judge constituted a due process violation. Miller v. Carroll, 2020 WI 56, 392 Wis. 2d 49, 944 N.W.2d 542. "To assess whether the probability of actual bias rises to the level of a due process violation, we apply, verbatim, the standard from Caperton." Id., ¶24.

Highlighting this court's rejection of a constitutionally-infirm proposal to require recusal from cases involving parties who contributed $15,000 to a justice's campaign,[25] Protasiewicz's media apologists either misunderstand or misrepresent Caperton.

---

[25] S. Ct. Order 17-01 (issued June 30, 2017).

23

It isn't just about the money, although anyone equating $10,000,000 and $15,000 exhibits something more than bad arithmetic. Caperton is based on an enduring principle, pronounced decades ago by the United States Supreme Court: "Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to prevent even the probability of unfairness.'" Withrow, 421 U.S. at 47.

The probability of actual bias on Protasiewicz's part likely approaches 100%. Wisconsin's Code of Judicial Conduct defines "Impartiality" as "the absence of bias or prejudice in favor of, or against, particular parties, or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge." SCR 60.01(7m). "A judge, candidate for judicial office, or judge-elect should not manifest bias or prejudice inappropriate to the judicial office." SCR 60.06(3)(a). "Expressions of bias or prejudice by a judge, even outside the judge's judicial activities, may cast reasonable doubt on the judge's capacity to act impartially as a judge." Comment to SCR 60.05(1). A mind made up on the campaign trail is unlikely to be magically opened after the election.

While Caperton likely governs recusal based on Protasiewicz's receipt of more than three times the amount deemed to offend due process in that case, Wisconsin's recusal rules govern her statements on the campaign trail:

> [A] judge shall recuse . . . herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial:
>
> . . .
>
> > (f) The judge, while a judge or a candidate for judicial office, has made a public statement that commits, or appears to commit, the judge with respect to any of the following:
> >
> > 1. An issue in the proceeding.
> > 2. The controversy in the proceeding.

24

SCR 60.04(4)(f) (emphasis added).

Protasiewicz is not the only occupant of the office of justice to declare her position on an issue everyone knew would be presented to the court upon her election. In March 2023, in support of Protasiewicz's campaign, Karofsky said: "When it comes to the maps, the maps are rigged. I wrote in a dissent that the maps, I didn't use the word rigged, but if you read the dissent that I wrote in the final case in WEC v. Johnson err—Johnson v. WEC, you will see those maps are rigged. You can't be in this state and not realize that. Janet Protasiewicz is saying the quiet part out loud."[26] One can't be in this state and not realize that at least some members of the majority already made up their minds on the issues presented in this petition. "'[T]he most sacred of the duties of a government is to do equal and impartial justice to all its citizens.'" United States v. Surratt, 855 F.3d 218, 220 (4th Cir. 2017) (Wynn, J., dissenting from dismissal) (quoting Thomas Jefferson). The constitutional guarantee of due process embodies this first principle.

### III. A Mad Tea-Party

"Decisions first, principles later." Robert H. Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L.J. 1, 5 (1971).

The petitioners pose five claims, any one of which would suffice to reach the majority's preordained outcome in this case, but the majority selects two, the better to expedite its resolution of this case in petitioners' favor and perhaps dodge United States Supreme Court review:

1. Do the existing state legislative maps violate the contiguity requirements contained in Article IV, Sections 4 and 5 of the Wisconsin Constitution?

This question was asked, and answered in the negative, in Johnson III, 401 Wis. 2d 198, ¶70 ("The assembly districts are contiguous and sufficiently compact.").

---

[26] Frederica Freyberg, Jill Karofsky on the 2023 Wisconsin Supreme Court Election, PBS Wis. (Mar. 31, 2023), https://pbswisconsin.org/news-item/jill-karofsky-on-the-2023-wisconsin-supreme-court-election/.

25

2. Did the adoption of the existing state legislative maps violate the Wisconsin Constitution's separation of powers?

This question could have been asked, but was not. The petitioners could have moved to intervene in the Johnson litigation two years ago, but did not, and instead waited for the membership of the court to change before bringing this claim. If the majority were consistent in its treatment of parties who sleep on their rights in this manner, they would apply the doctrine of laches onto which they latched to avoid answering unsettled issues in prior cases. See, e.g., Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568; Hawkins v. WEC, 2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877 (applying laches to bar action filed two days after certification of candidates for election). Of course, those cases involved challenges to the administration of elections which produced outcomes the majority favored.

The court should deny this petition because it relitigates claims this court only recently decided in Johnson III, 401 Wis. 2d 198, and asserts claims that could have been brought by intervention at the outset in Johnson I, 399 Wis. 2d 623, in 2021. Only a change in court membership makes a do-over possible, as the litigants recognized by announcing their plan to file an original action just two days after Protasiewicz's election[27] and by filing this petition one day after her term began. At least one member

---

[27] Jack Kelly, Liberal Law Firm to Argue Gerrymandering Violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461- 10b3d20d5f00.html.

26

of the current majority—Ann Walsh Bradley—has repeatedly decried altering precedent based on a change in court membership:[28]

- "Before concluding, I observe that the majority's analysis and its overruling of Ferdon depart from the time-honored principle of stare decisis. We decided Ferdon only thirteen years ago. '[R]espect for prior decisions is fundamental to the rule of law.' Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (2003). 'Stare decisis is the preferred course of judicial action because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process.' Id., ¶95. 'The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed.' Id.; see also Bartholomew v. Wisconsin Patients Comp. Fund and Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶32, 293 Wis. 2d 38, 717 N.W.2d 216 ('No change in the law is justified by a change in the membership of the court[.]')." Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶¶ 109-110, 383 Wis. 2d 1, 61, 914 N.W.2d 678, 707 (Ann Walsh Bradley, J., dissenting).

- "Stare decisis (Latin for 'let the decision stand') is a basic tenet of the rule of law. Although stare decisis is not a mechanical formula requiring blind adherence to precedent, departing from precedent requires special justification, and '[n]o change in the law is justified by a change in the membership of the court or a case with more egregious

---

[28] This is not the first time Ann Walsh Bradley upended established precedent after a change in the membership of the court. In 2006, she joined a majority in overturning Panzer v. Doyle, 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666, which the court had decided just two years earlier. See Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶286, 295 Wis. 2d 1, 719 N.W.2d 408 (Roggensack, J., concurring in part/dissenting in part) ("The decisions of this court are final if not set aside on a motion for reconsideration in the case in which the ruling was issued, Wis. Stat. § 809.64 (2003-04), or overturned by a federal court on a federal question, see State v. Webster, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474 (1983). Notwithstanding this rule of law, at the request of the Governor, the majority opinion takes up an issue we decided in 2004 and puts it into the appeal of a 2001 circuit court decision.").

27

facts.'" St. Croix Cnty. Dep't of Health & Hum. Servs. v. Michael D., 2016 WI 35, ¶85, 368 Wis. 2d 170, 880 N.W.2d 107 (Abrahamson & Ann Walsh Bradley, JJ., dissenting) (footnotes omitted; alteration in opinion). "Nothing aside from the membership of the court has changed since Steven H. A change in membership of the court does not justify a departure from precedent." Id., ¶93.

Nothing aside from the membership of the court has changed since Johnson III. The majority abandons inconvenient principles that would otherwise obstruct its activism.

IV. The Queen's Croquet-Ground

In resurrecting the following issues from last year's litigation and imposing them on parties who haven't raised them, the majority tips its hand; it will overrule Johnson I and Johnson III, supplant the rule of law with the collective will of four members of the court, and replace last year's judicial remedy with an entirely political one:

1. If the court rules that Wisconsin's existing state legislative maps violate the Wisconsin Constitution for either or both of these reasons and the legislature and the governor then fail to adopt state legislative maps that comply with the Wisconsin Constitution, what standards should guide the court in imposing a remedy for the constitutional violation(s)?

2. What fact-finding, if any, will be required if the court determines there is a constitutional violation based on the contiguity clauses and/or the separation-of-powers doctrine and the court is required to craft a remedy for the violation? If fact-finding will be required, what process should be used to resolve questions of fact?[29]

That which was constitutional in 2022 cannot become unconstitutional in 2023, even if the majority so decrees. Nevertheless, the standards by which the court in 2022 ordered a remedy for the inequality of the people's representation in the state legislature will be discarded by the majority, in a grave affront to the rule of law.

---

[29] The majority's nonsensical final question in the order betrays its inability to distinguish a legal claim from a factual one.

28

In exercising unbridled power absent lawful authority, the members of the majority will violate the Wisconsin Constitution, arrogating unto themselves purely legislative power the people never gave them. Granting this original action petition "is a naked judicial claim to legislative—indeed, *super*-legislative—power; a claim fundamentally at odds with our system of government." Obergefell v. Hodges, 576 U.S. 644, 717 (2015) (Scalia, J., dissenting). "By vesting certain powers exclusively within each of the three co-equal branches of government, the drafters of the Wisconsin Constitution recognized the importance of dispersing governmental power in order to protect individual liberty and avoid tyranny." League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶31, 387 Wis. 2d 511, 929 N.W.2d 209. Tyranny may wear a black robe. See Johnson I, 399 Wis. 2d 623, ¶ 80 (citing In re Review of the Code of Judicial Ethics, SCR Chapter 60, 169 Wis. 2d xv, xxv (1992) (Day, J., concurring, joined by a majority) ("Tyranny need not be dressed in a military uniform, it can also wear a black robe!"). "[L]iberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." The Federalist No. 78, at 523 (Jacob E. Cook ed., 1961) (Alexander Hamilton). In Wisconsin, that fear has come to pass.

"A system of government that makes the People subordinate to a committee of nine unelected lawyers does not deserve to be called a democracy." Obergefell, 576 U.S. at 717 (Scalia, J., dissenting). Although Wisconsin's justices are elected, democracy also does not countenance a system of government that subordinates the people of Wisconsin to a committee of four lawyers, regardless of how they are chosen. After all, justices are elected to exercise judicial power, not to fulfill the wishes of their political benefactors. See Williams-Yulee v. Fla. Bar, 575 U.S. 433, 446-47 (2015) ("In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors."). Under our Wisconsin Constitution, judicial power is the only authority the people gave this court. Wis. Const. art. VII, § 2. Judicial elections cannot override the constitution.

Ultimately, petitioners ask the court to unseat Wisconsin's duly elected senators by judicial decree—"off with their heads!" The majority's acquiescence to this unprecedented demand would deal a death blow to democracy in this state. Wisconsin citizens would become the majority's subjects, at the mercy of the masters who were once the People's servants.

\* \* \*

29

> The democratic integrity of law . . . depends entirely upon the degree to which its processes are legitimate. A judge who announces a decision must be able to demonstrate that he began from recognized legal principles and reasoned in an intellectually coherent and politically neutral way to his result. Those who would politicize the law offer the public, and the judiciary, the temptation of results without regard to democratic legitimacy.

Robert H. Bork, The Tempting of America: The Political Seduction of the Law 2 (1990). The outcome of this original action has been predetermined. In granting this petition, four members of this court pretend the Johnson litigation never happened. ("'Oh, I've had such a curious dream!' said Alice.")[30] Their perverse politicization of this state's highest court begins with the results—"Fair maps!"—and will end with decisions devoid of democratic integrity, and without democratic legitimacy. Would that it were The End, but the majority's degradation of the court is only just beginning. Through the Looking Glass[31] we go.

I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

---

[30] Lewis Carroll, Alice's Adventures in Wonderland 189 (1865).

[31] Lewis Carroll, Through the Looking Glass, and What Alice Found There (1871).

30

BRIAN HAGEDORN, J. (*dissenting*). The drawing of legislative districts stirs sincere and passionate disagreement. As a court of law, however, we must be guided by something beyond political and policy debates. If we were following the normal judicial process, this petition for an original action would be unanimously denied. Two years ago, this court stepped into redistricting because the legislature did not enact new maps into law, which the Wisconsin Constitution requires every ten years.[32] Courts cannot pass laws, of course. But they can impose a suitable remedy for constitutional violations. We did so, and selected state assembly and senate maps after receiving proposals submitted

---

[32] The Wisconsin Constitution states that "the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants," following the federal government's decennial census. Wis. Const. art. IV, § 3. From our founding as a state, the legislature has always accomplished this by enacting a reapportionment bill into law with the governor exercising his constitutional power to veto legislation. State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 558, 126 N.W.2d 551 (1964). When the legislature attempted to reapportion districts in 1964 by joint resolution (so that the Governor could not use his veto pen), we rejected the move and held that enactment by law is what the constitution requires. Id. at 558-59.

31

by the parties in the case.[33] We concluded, among other things, that the maps we settled on complied with the requirements of the Wisconsin Constitution. That judicial remedy remains in place today, filling the gap until such time as the legislature enacts new maps into law.

The petitioners now seek to reverse multiple decisions of this court and the ongoing remedy we put in place in a case they

---

[33] At the outset of the litigation, we invited the parties to submit proposed maps consistent with criteria we would provide. Johnson v. WEC, No. 2021AP1450, unpublished order (Wis. Nov. 17, 2021). We later discussed the legal requirements and criteria we would use to select maps in our first of three opinions in the case. Johnson v. WEC, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469 (Johnson I). Given our narrow remedial task of adjusting districts to resolve population disparities, we determined we would select maps that complied with all legal requirements and departed the least from existing law—that is, the districts last enacted into law. Id., ¶¶24-38, 64-68, 73-79. Following the submissions, we initially selected the Governor's legislative maps because we determined they made fewer changes to existing districts than the other proposals we received. Johnson v. WEC, 2022 WI 14, ¶¶8-10, 400 Wis. 2d 626, 971 N.W.2d 402 (Johnson II). The United States Supreme Court then clarified that we could select the Governor's race-conscious maps only if it was proven before us that a race-neutral alternative violated the Voting Rights Act. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 403-04 (2022) (per curiam). We reconsidered, concluded the Governor's maps did not pass that hurdle, and selected the only race-neutral legislative maps proposed to us—those of the legislature. Johnson v. WEC, 2022 WI 19, ¶¶2-3, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III). We did not do so because the legislature had some type of preferred status in the litigation before us. As explained in the previous footnote, the legislature's constitutional prerogative and responsibility encompasses enacting maps into law. Wis. Const. art. IV, § 3. Because it did not accomplish this task, the legislature appeared before us simply as one of several parties to the litigation. The same was true of the Governor. He stood on equal footing with all other parties in the litigation, each of whom could have submitted maps that better complied with all relevant laws and our directive to minimize change from the maps then codified into law.

could have participated in, but chose not to.[34] Parties, however, generally cannot challenge judicial remedies in this fashion. This petition appears to be a collateral attack on the court's decisions and orders in Johnson v. WEC. Procedurally, this is highly unusual, and it may be impermissible under the law.[35] Nevertheless, the court today votes to take this case and consider two questions.

First, we are asked to overturn two decisions from Johnson and hold that the Wisconsin Constitution requires districts to be physically contiguous.[36] This despite the fact that the legislature has considered political contiguity (keeping municipalities together) to be constitutionally sufficient for at least the last 50 years.[37] In 1992, the federal court handling a

---

[34] We invited any interested parties—including individual voters—to join the case at the beginning stages of the litigation. Johnson v. WEC, No. 2021AP1450, unpublished order (Wis. Sept. 22, 2021). Many did; we denied none the opportunity to participate.

[35] The normal rule in litigation is that judgments are binding and final. Oneida Cnty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶28, 299 Wis. 2d 637, 728 N.W.2d 652. Generally, unless a judgment is the result of fraud or some other narrow exception, parties may not challenge judgments indirectly through a separate proceeding—called a collateral attack. Id. Attempts "to avoid, evade, or deny the force and effect of a judgment in an indirect manner" will ordinarily not be entertained because they disrupt finality, undermine the court, and impair the administration of justice. Id., ¶¶27-28 (quoting another source).

[36] Johnson I, 399 Wis. 2d 623, ¶36 (affirming the federal court's conclusion in Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992), that detached, municipal islands constitute sufficient legal contiguity under Article IV, Section 4 of the Wisconsin Constitution); Johnson III, 401 Wis. 2d 198, ¶70 (holding that the assembly districts, three of which make up a senate district, satisfied the constitution's contiguity requirement).

[37] The brief by the Republican senators points to a statute passed in 1971—after the legislature adopted new maps—that appears to reflect this view: "In designing the districts, the following factors are considered as coequal in precedence: compactness, contiguity of area, and community of interest. Island territory (territory belonging to a city, town or village but not contiguous to the main part thereof) is considered a contiguous part of its municipality." Wis. Stat. § 4.001(2) (1971-72).

redistricting impasse explicitly considered this issue and adopted politically (but not physically) contiguous maps.[38]  The federal court adopted similar maps in 2002.[39]  No one protested on this ground when the legislature enacted new maps into law doing the same in 2011.[40]  And no parties in Johnson argued this point when we affirmed that political contiguity was constitutionally sufficient.[41]  Yet the voter-petitioners here have determined that now is the time to take a fresh look.  They were inspired to challenge longstanding precedent and practice on August 2, the day after a new justice was sworn into office—a remarkable coincidence.

The second issue also runs headlong into our decisions in Johnson.  The petitioners argue that this court violated the separation of powers by adopting a judicial remedy proposed by the legislature, whom we admitted as a party to the litigation.[42]  This is so, they assert, because the legislature previously tried to pass into law the maps it later submitted to this court, and the Governor vetoed them.  We do not enact laws, though.  So the theory appears to be that this court cannot adopt a judicial remedy in litigation that was also an unsuccessful piece of legislation.

There'll be time enough to evaluate the merits of these arguments as this case unfolds.  But make no mistake, the process here smells.  Everyone understands that this case is aimed at something beyond newfound concern for the constitution's contiguity requirement or whether failed legislation can be used as a judicial remedy.  It is a search for some plausible legal basis—anything will do, really—to green-light a judicially commanded political realignment of state government.  This case is an outcome in search of a theory.

And the court is happy to oblige.  Despite the petitioners standing by until the court's composition changed, the court dutifully adopts an accelerated briefing and oral argument

---

[38] Prosser, 793 F. Supp. at 866.

[39] Baumgart v. Wendelberger, Nos. 01-C-0121, 02-C-0366, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

[40] 2011 Wis. Act 43.

[41] Johnson I, 399 Wis. 2d 623, ¶36; Johnson III, 401 Wis. 2d 198, ¶70.

[42] See supra n.2 (explaining the status of the legislature as a party to the litigation).

schedule. It even changed our internal writing deadlines on original actions to ensure this case would be fast-tracked. Further, the court directs the parties to brief an almost identical question to the one we addressed in Johnson I: what standards should guide the court in imposing a remedy if the current district lines are unlawful? Asked and answered, methinks. But the goal is to get this court into the business of being the supreme guardian of "partisan fairness" in map-making—contrary to what we just held—and to do so before the next election cycle.

Were it otherwise, there's no way we would take a case in this posture and on this pseudo-emergency schedule—one brought by parties who strategically sat on their hands for years, who were invited to join the last redistricting case and did not, and who now seek to disturb the ongoing judicial remedy in that case on issues we already decided. An ordinary court would see the political gamesmanship for what it is, deny the petition, and move on. These are not, I'm afraid, ordinary times, and this is not an ordinary court.

Granting this petition comes at a steep price. Politics may be a team sport, but judging is not. We have no partisan team when deciding cases. Instead, we have sworn an oath to decide cases as neutral arbiters of the law, with no thumb on the scale for anyone. The more we accommodate those who wish to use this court as a weapon in the political wars raging among us, the more we depart from the modest role the constitution assigns to us and invite even more political gamesmanship. Those hoping the judiciary will boldly take up the mantle of guaranteeing "partisan fairness" for legislative maps may uncork their champagne in the short term. But the celebration won't last long. In the end, few will be happy, the politicization of the judiciary will worsen, and this litigation will never truly end.

I respectfully dissent.

I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

35